Dr. Ronnie ROGERS et al.,
Plaintiffs-Appellants,

v.

Dr. M. L. BROCKETTE et al.,
Defendants-Appellees.

No. 78–2505.

United States Court of Appeals,
Fifth Circuit.

Feb. 2, 1979.

Earl Luna, Thomas V. Murto, III, Dallas, Tex., for plaintiffs-appellants.

John L. Hill, Atty. Gen., Susan J. Dasher, Nathan Johnson, David M. Kendall, Jr., Robert Steve Bickerstaff, Jr., Asst. Attys. Gen., Austin, Tex., for defendants-appellees.

Paula Roberts, Roger Schwartz, Ronald Pollack, Food Research and Action Center, Washington, D.C., amicus curiae, for Food Research and Action Center.

Before SKELTON,* Senior Judge and GOLDBERG and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

Since 1966 the federal government has subsidized breakfasts for school children. Participation in this school breakfast program is voluntary, but Congress left it unclear whether the choice to participate is to be made by the individual school, the local school board, or the state. A Texas state statute requires certain school districts to participate. One of those districts, the Garland Independent School District (GISD), resisted and filed this suit in federal district court for declaratory and injunctive relief. GISD named state education authorities as defendants and claimed that the Texas statute is unconstitutional because it conflicts with the federal program.

The district court granted summary judgment for the defendants, and GISD appeals. We are faced with a question of standing as well as the substantive issue of whether the Texas statute violates federal law.

I.

The school breakfast program is one of several federal programs [1] designed to improve the nutrition of school children. It is administered by the Department of Agriculture. See 42 U.S.C. §§ 1771, 1779. Participating schools must agree to abide by several regulations governing the quality and availability of the breakfasts. See generally 7 C.F.R. § 220.8. Children from poorer families are eligible to receive the breakfasts free or at a reduced price. See 7 C.F.R. §§ 220.19, 245.1–245.11. A participating school receives a subsidy for each breakfast it serves; free breakfasts, naturally, are subsidized at a higher rate than reduced price or full-price breakfasts. See 7 C.F.R. § 220.9.

Federal law does not require any school, school district, or state to participate in the breakfast program. But in 1977, Texas enacted a statute, § 21.914 of Title 2 of its Education Code, providing:

> If at least 10 percent of the students enrolled in one or more schools in a school district are eligible for free or reduced-price breakfasts under the national school breakfast program . . . the governing board of the district shall participate in the program and make the benefits of the program available to all eligible students in said schools.

GISD does not currently serve breakfasts in its schools and does not wish to subscribe to the federal breakfast program. Section 21.-914, however, would require GISD to serve federally subsidized breakfasts in at least twenty-two of its schools. GISD says that in order to do so it would have to spend

---

* Senior Judge, United States Court of Claims, sitting by designation.

1. See, e. g., 42 U.S.C. §§ 1751–1769a (school lunch program); id. at § 1772 (special milk program); id. at § 1773 (school breakfast program).

approximately $26,000 to modify its buildings and purchase new equipment, and then spend an additional $114,000 annually for salaries and utilities. These expenses, it says, would not be covered by federal reimbursements.[2]

GISD claimed that § 21.914 is void under the supremacy clause because it conflicts with the statutes establishing the federal school breakfast program and with regulations issued pursuant to those statutes. Specifically, GISD says that the state statute, mandating the participation of certain school districts, conflicts with the federal statute and regulations, which, according to GISD, give it the right to refuse to participate. The members of GISD Board of Trustees in their official capacities joined in the suit, as did several taxpayers in the Garland School District. The United States District Court for the Northern District of Texas granted summary judgment for the defendants. It held that none of the plaintiffs had standing to bring the suit; it also ruled that there was no conflict between § 21.914 and the federal program. For reasons we give in the next section we believe that plaintiff GISD has standing. Since the district court had jurisdiction over GISD's claim,[3] we can reach the merits without deciding whether the suit could have been brought by taxpayers of the GISD or by members of the GISD board of trustees suing in their official capacities. On the merits we affirm the district court's decision.

---

**2.** See footnote 3 infra.

**3.** GISD claims that participating in the program will force it to spend well over $10,000 on equipment, utilities, and additional salaries. Since the federal government will not necessarily reimburse GISD for those expenses, see 42 U.S.C. §§ 1773(d), 1774, we cannot say "to a legal certainty," St. Paul Mercury Indemn. Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938), that $10,000 or less is in controversy. Thus, the district court had jurisdiction over GISD's claim. 28 U.S.C. § 1331(a). See also Opelika Nursing Home, Inc. v. Richardson, 448 F.2d 658, 663 (5th Cir. 1971).

**4.** Depending on how broadly it is interpreted, this requirement is either identical with or an aspect of the rule that a case must be "justiciable." See generally Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947

## II.

Texas asserts that GISD has no standing to bring this suit. Texas relies entirely on a line of cases which, it claims, hold that a municipality has no standing to sue the state of which it is a creature, see, e. g., *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *City of Trenton v. New Jersey*, 262 U.S. 182, 187, 43 S.Ct. 534, 67 L.Ed. 937 (1923), and argues that these decisions require us to deny standing to a political subdivision attempting to sue the state that created it. But before we can discuss these decisions, we must decide whether GISD can bring this suit under the more general principles developed by the Supreme Court to govern standing in all federal cases.

### A.

Three of those principles are particularly important here. First, in order to sue in federal court, a plaintiff must allege "a distinct and palpable injury" to itself. *E. g., Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Second, ordinarily a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499, 95 S.Ct. at 2205. Third, a claim must present a genuine, live case or controversy[4] under Article III.[5] In this case GISD has alleged

---

(1968). Standing is also an aspect of justiciability. *Id.* at 1950.

**5.** These three criteria, among others, were in effect specified by the Supreme Court in its most recent substantial treatment of standing. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 2630–34, 57 L.Ed.2d 595 (1978). To be precise, the Court made explicit the constitutional requirement of injury in fact and the "general prudential" rule that a party can usually assert only its own claims. *Id.* at 2631, 2634. Instead of speaking of the need for a genuine case or controversy, however, it said that a plaintiff must establish a reasonable "causal connection between the claimed injury and the challenged conduct," *id.* at 2630. As we discuss, this is a variation of the requirement of a real controversy. *See* p. 1063 and n. 12 *infra*.

$26,000, plus $114,000 annually, worth of "threatened or actual injury," *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). This satisfies the first requirement, but the other two criteria pose more difficult problems.

It might be argued, for example, that GISD is asserting not its own rights but the rights of its trustees, who are legally third parties. GISD seems to assert, and can plausibly assert,[6] only one right allegedly arising under the federal breakfast statutes—the right to decide, on the local level, whether to accept the breakfast program. This right, instead of belonging to the GISD itself, may belong to the members of the GISD board of trustees; there is some authority that members of a governmental body have an "interest in maintaining the effectiveness of their votes," *Coleman v. Miller,* 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939), which entitles them to sue if the body is deprived of some lawful prerogative. *See id.* (state legislators); *Kennedy v. Sampson,* 167 U.S.App.D.C. 192, 511 F.2d 430 (1974) (United States Senators). *See also Board of Educ. v. Allen,* 392 U.S. 236, 241 n.5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (school board members' oath to support Constitution gives them standing to challenge constitutionality of statute they must administer). If this right does belong solely to the members of the GISD board of trustees, the GISD itself ordinarily[7] would be barred from asserting it by the principle that a party can assert only its own claims and not those of a third party.[8]

We believe, however, that the policies underlying this principle dictate that the GISD itself be allowed to assert the supposed right to decide whether to accept the breakfast program. For example, one reason for prohibiting a litigant from asserting another person's rights is to ensure that the inappropriate party cannot force an issue to be decided in court, or, as the Supreme Court has said, to "avoid . . . the adjudication of rights which those not before the Court may not wish to assert." *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978). For better or worse, it is a premise of the federal judicial system that not all disputes are to be resolved in court. And this premise suggests that if a dispute can be resolved in some other way to the satisfaction of those most concerned, that resolution should not be upset by a court. The limits on asserting third parties' rights ensure that such a resolution will not be upset by those whom the legislature was not interested in protecting. *Cf.* Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1735–36 (1975) (requirement of an actual injury protects such resolutions from being upset by those who are not affected at all). Of course, these principles do not excuse or justify a narrow and cramped approach to standing that excludes persons who are en-

---

**6.** *See* note 9 *infra.* If GISD claimed that the federal statutes are intended to protect school districts against possible expenses resulting from the state's imposing the program, it would be asserting its own right to such protection. But as our discussion of the merits suggests, *see* Part III *infra,* that claim is far weaker than the claim that Congress intended simply to protect the right to decide whether to accept the program.

**7.** There are some exceptions to this principle that a litigant can assert only its own claims and not those of a third party, *see, e. g., Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), but we need not decide if any are applicable here.

**8.** This requirement serves much the same function as the rule, apparently applicable at least in determining standing under § 10(a) of the

Administrative Procedures Act, 5 U.S.C. § 702, that a complaining party has standing if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Also, as the Supreme Court has noted, *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), the limit on asserting third parties' claims "bear[s] some resemblance" to the requirement, applied only in taxpayers' suits, *id.* at 2633–34, that a plaintiff show a "nexus" between its injury and the legal right it asserts. *See Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

titled to relief and can gain it only in a court. And in many cases it will be appropriate, for a variety of reasons, to permit a litigant to assert another party's rights. *See generally* Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423 (1974). In theory, however, a principal purpose of standing doctrine is to prevent the inappropriate party from forcing a judicial resolution of an issue.

When we apply this theory to GISD's claim we are compelled to conclude that the GISD is an appropriate party to force a judicial resolution of the issue it raises. GISD alleges that Congress has made it the proper body to decide at least some significant questions under the breakfast program. This is not a frivolous allegation, so for the purposes of deciding this preliminary question of standing we must assume that it is correct.[9] If Congress did repose such powers in the GISD, it plainly wanted GISD to affect decisions about whether and when the program was adopted. This suggests that Congress would not have objected to GISD's forcing a judicial resolution of a conflict between itself and the state over this issue. By contrast, a suit by an interested outsider might upset a political accommodation acceptable to GISD, the party which, by hypothesis, is entitled to decide what should be accepted.

■ We are led to the same conclusion— that GISD should be allowed to bring this suit—by another policy underlying the rule against claiming third parties' rights. One reason to confer standing on a party is to encourage the court to approach the case from that party's point of view; the rule against asserting third parties' rights is intended partly to ensure that the court will approach the case from the point of view of those whom Congress wants to aid or protect or whose rights Congress wants to vindicate. A case arising under a statute restricting a bank's activities, for example, may appear in one light when seen from the point of view of the bank's competitors and quite another from the perspective of the bank's customers. The decision whether the customers or competitors have standing to raise a claim is important partly because it affects the way the court is likely to focus on the issues.[10]

■ In this case the most appropriate perspective for us to adopt in focusing on the issues is that of the GISD. The issue in this case is whether GISD or the state has been empowered, by Congress, to make a certain central decision about the breakfast program. The school board and the state represent different political interests with different degrees of influence; a group can be a statewide minority, for example, but a majority in certain localities. The issue we must decide, then, is which particular combination of interests Congress intended to protect and promote. We can best focus on this issue by having before us the repre-

9. In *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court rejected the view that a plaintiff has standing only if it can show a "protected legal interest"; that inquiry, the Court said, "goes to the merits", and standing is a preliminary issue. *Id.* at 153, 90 S.Ct. 827, 830. The Court then specified that an injured party has standing if it asserts an interest "*arguably* within the zone of interests to be protected . . . by the statute . . . in question." *Id.* (emphasis added). This test seems to align the inquiry into standing with the test for federal question jurisdiction, which is that a complaint asserting a federal claim can be dismissed for lack of jurisdiction only if it is "wholly insubstantial and frivolous" or "patently without merit." *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

10. This example is suggested by *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). There the Court granted banks' competitors standing to challenge an agency's decision that various activities were permitted by the National Banking Act, 12 U.S.C. § 24(7). Commentators have criticized the decision on the ground that it led the Court to examine issues under the Act from the competitors' point of view when the Act is more plausibly seen as an effort to protect customers. As a result, commentators say, the Court's interpretation of the Act was distorted. *See* Stewart, *supra,* 88 Harv.L.Rev. at 1732–33. Instead of simply granting standing to the competitors, these commentators say, the Court should have recognized an exception to the rule against raising third parties' claims and allowed the competitors standing explicitly to assert the customers' rights. *See id.* at 1733.

sentatives of the two competing combinations of interests. In other words, the school board itself should assert the plaintiff's case. The perspective we might adopt if a taxpayer brought this suit, for example, might be significantly different, and would be less likely to focus our attention on the combination of interests Congress was attempting to protect when, and if, it empowered the school board to accept or reject the breakfast program.[11] For these reasons, the rule against asserting third parties' claims does not bar GISD from bringing this suit.

There remains only the third requirement; this litigation must present a genuine case or controversy under Article III. One aspect of the requirement of a genuine case or controversy is the principle that a federal court may not resolve "hypothetical or contingent questions." *Alabama State Federation of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). Nor may a federal court render advisory opinions. *E. g., Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 1950–51, 20

L.Ed.2d 947 (1968); *United States v. Freuhauf,* 365 U.S. 146, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961). As the Supreme Court has recently emphasized in a context that is only slightly different, an injured party cannot sue unless "the exercise of the Court's remedial powers would redress the claimed injuries." *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978). There must be a "substantial probability . . . that, if the court affords the relief requested," the plaintiffs' legal injuries will be remedied. *See Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975).[12]

In the case before us it might be thought that our judgment is unlikely to relieve the plaintiffs' injury because Texas can defeat any judgment simply by abolishing the GISD. For this reason, it might be argued, our decision would be purely advisory, or at least "hypothetical and contingent," and the requirements of Article III would be unmet.

It is, to be sure, undisputed that Texas can abolish the GISD.[13] The United

---

11. We do not mean to decide whether the taxpayers would have had standing to bring this suit. We do mean to say, however, both that GISD has standing and that in many ways it is an especially appropriate plaintiff, so that our decision to confer standing on it and to pretermit the claims of the taxpayers and the individual members of the GISD board of trustees suing in their official capacities, *see* p. 1061 *supra,* was not arbitrary.

12. The Court has equated this principle to its rule that a plaintiff has no standing unless its injuries "fairly can be traced to the challenged action of the defendant," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41, 43, 96 S.Ct. 1917, 1925, 1926, 48 L.Ed.2d 450 (1976). *See also Warth v. Seldin,* 422 U.S. 490, 504, 506–07, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In the recent cases discussing this rule, the issue had been whether the actions of some "third part[y] not before the court," *see Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1976), would nullify the court's decree and leave the plaintiff with no relief from its injuries, *see Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45

L.Ed.2d 343 (1975); here the danger is that the defendant itself will nullify the judgment. These decisions have been severely criticized. *See, e. g.* Sager, Insular Majorities Unabated: *Warth v. Seldin* and *City of Eastlake v. Forest City Enterprises, Inc.,* 91 Harv.L.Rev. 1373, 1382–88 (1978). But there seems to be little disagreement with their premise that in our system federal courts will act only if a favorable decree would significantly increase the plaintiff's chances of gaining some cognizable legal benefit. Compare *id.* at 1385–88 *with Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

13. We assume that the GISD is not claiming that the federal breakfast statutes require Texas to maintain local school boards or comparable entities; we take GISD to be arguing only that as long as school boards exist, they, and not state authorities, are entitled to decide whether to accept the breakfast program. Therefore we must determine whether Texas's power to abolish the GISD makes any judgment we might render an advisory opinion. In any event, since we reject GISD's more modest claim on the merits, *see* Part III *infra,* we would *a fortiori* reject the broader claim that Texas is obligated to maintain school districts. So even if GISD did make the broader claim we would have to discuss the effect on our jurisdiction of Texas's power to abolish GISD.

States Constitution contains no general [14] limit on a state's ability to abolish or reorganize a municipality or another political subdivision like a school district. *See e. g., Hunter v. City of Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907). But it scarcely follows that because Texas can, in this sense, circumvent our judgment, our judgment would be only advisory or hypothetical. Texas can abolish the GISD only by enacting a statute; an administrative regulation will not suffice. *See* Tex.Educ. Code Ann. tit. 2, § 11.14. Moreover, the GISD performs a variety of functions connected with education. *See* p. 1065 *infra.* If Texas abolished the GISD it would presumably have to undertake many of those functions itself, and to that extent administer Garland schools directly.[15] This is a heavy price to pay to avoid a judgment dealing with only one aspect of education. The political difficulty of passing a statute abolishing GISD in the face of the well-known tradition of local autonomy in education, and the burdens Texas would have to bear if it did take over a GISD's functions directly, convince us that there is at least a "substantial probability," *see Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975), that GISD would receive the fruits of a favorable judgment.

■ The relatively few Supreme Court decisions addressing this issue reinforce our conclusion. The Court has indicated its willingness to decide a suit between states for money damages, in its original jurisdiction, even if it has no way to enforce its award against a recalcitrant loser, *see e. g., South Dakota v. North Carolina,* 192 U.S. 286, 24 S.Ct. 269, 275–77, 48 L.Ed. 448 (1904); the Court said that it was prepared to "rely on the good faith of state governments or other public bodies to respond to its judgments." *Glidden Co. v. Zdanok,* 370 U.S. 530, 571, 82 S.Ct. 1459, 1483–84, 8 L.Ed.2d 671 (1962) (plurality opinion). Here we have, as surety for Texas's good faith, the difficulty—practical and political—of circumventing our decision. Similarly, in *Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), the Supreme Court agreed to review decisions of the Court of Claims even though large money judgments could, at that time, be enforced against the United States only if Congress specifically appropriated the funds. *See id.* at 1482–84.[16] The Court said that "Congress . . . has sought to avoid interfering with" the collection of Court of Claims judgments, and that historically parties awarded money judgments against the United States have had far more success in collecting than parties who won in private litigation. *Id.* at 1483. Similarly, the tradition of local autonomy in education seems long and powerful in Texas. *See generally San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 6–7, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Moreover, the *Glidden* court distinguished an earlier case, *Gordon v. United States,* 69 U.S. (2 Wall.) 561, 117 U.S. 697 (1885), in which the Supreme Court had refused to take jurisdiction over appeals of the Court of Claims when that court's judgments could be revised by the Secretary of the Treasury. This suggests that we should be influenced by the fact that the GISD can be abolished only by statute, not by an administrative rule or fiat. *See* p. 1064 *supra. See also Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948). Finally, in

**14.** A state's decision to abolish or to reorganize a municipality can, of course, violate a particular constitutional guarantee like the fifteenth amendment. *See, e. g., Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 128–29, 5 L.Ed.2d 110 (1960). But the mere act of abolishing or reorganizing a municipality does not by itself invoke any constitutional provision.

**15.** As we have said, we take GISD to be arguing that the federal statute empowers school districts to decide whether to accept the break-

fast program, so long as school districts exist. *See* footnote 13, *supra.* If this view is correct, Texas would have to administer Garland schools directly to the degree necessary to make the GISD nonexistent for purposes of the federal statute.

**16.** Now there is a general appropriation of whatever sums are necessary to satisfy any judgment of the Court of Claims. 31 U.S.C. § 724a.

*United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court acknowledged that the President could "theoretically" revoke the regulation empowering the Watergate Special Prosecutor; but at least until the President did so, the Court held, litigation between the Special Prosecutor and the President was a justiciable controversy. *Id.* at 695–97, 94 S.Ct. 3090. The Court did mention that "the delegation of authority to the Special Prosecutor . . . [was] not an ordinary delegation by the Attorney General to a subordinate officer" because regulations provided that the special prosecutor was not to be removed without a "consensus" of certain members of Congress. 418 U.S. at 696, 94 S.Ct. at 3102.[17] But as we have noted, p. 1064 *supra,* Texas can disestablish the GISD only by passing a statute, not by administrative action. Moreover, in *United States v. Nixon* the Court emphasized "the unique facts of this case"; this may suggest that the key to the decision was the political cost of dismissing the Special Prosecutor. *See* The Supreme Court, 1973 Term, 88 Harv.L.Rev. 41, 52–53 (1974). For all of these reasons, the danger that our opinion will prove to be only advisory or hypothetical does not deter us from allowing GISD to bring this suit.

Closely related to the proscription of advisory opinions, however, is the principle that a federal court may not decide a case unless it "present[s] a real and substantial controversy," *Poe v. Ullmann,* 367 U.S. 497, 509, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961) (Brennan, J., concurring); in particular we may not decide a case in which one party "has no active participation" and "over which [it] has exercised no control." *United States v. Johnson,* 319 U.S. 302, 304–05, 63 S.Ct. 1075, 1076, 87 L.Ed. 1413 (1943). Some state agencies may well be so closely identified with the state government, and so thoroughly controlled by the body they are su-

ing that the litigation amounts to a suit by the state against itself; such a suit lacks the live adversariness we must find before we can entertain a case. *See South Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.,* 145 U.S. 300, 12 S.Ct. 921, 36 L.Ed. 712 (1892) (Court will not decide case in which plaintiff in error and defendant in error are controlled by same persons). *See also Fenner v. Continental Diving Service, Inc.,* 543 F.2d 1113 (5th Cir. 1976). The GISD is not this sort of agency, however. Both legally and practically, the GISD seems sufficiently independent of the state of Texas to ensure that a suit between them will be a genuinely adversary contest.

Legally, independent school districts in Texas have a variety of powers. They perform "all educational functions not specifically delegated" to the state education agencies. Tex.Educ.Code Ann., tit. 2, § 11.01. They are specifically empowered to make contracts, *id.,* §§ 23.26, 23.28, to levy and collect taxes, *id.* § 23.27, to obtain property by eminent domain, *id.* § 23.31, and generally "to manage and govern the public free schools of the district," *id.* § 23.26(b). They can sue and be sued. *Id.,* § 23.26(a).

The state can, to be sure, supervise the local boards to some degree. The state education authorities may review local school boards' decisions, Tex.Educ.Code Ann., tit. 2, § 11.13, and the local boards are bound by regulations issued by the state agency, *Bear v. Donna Ind. School Dist.,* 85 S.W.2d 797, 798 (Tex.Civ.App.1935). But local boards are then free to attack the state agency's decisions in court. *See e. g., Board of Trustees v. Briggs,* 486 S.W.2d 829 (Tex.Civ.App.1972). Thus it seems clear that local boards have some significant legal rights that the state agency cannot take away.

As a practical matter, too, local school boards seem likely to enjoy a good deal of freedom from state authorities. The mem-

---

**17.** The Court did not mention that this part of the regulation may have been unenforceable; it is not clear that members of Congress can participate in decisions to dismiss officers within the executive branch. *See* Freund, The Su-

preme Court, 1973 Term—Foreword: On Presidential Privilege, 88 Harv.L.Rev. 13, 16 n. 16 (citing *Myers v. United States,* 272 U.S. 52, 161–62, 47 S.Ct. 21, 71 L.Ed. 160 (1926)).

bers of the local boards are elected by the people of the district, not appointed from above. Tex.Educ.Code Ann., tit. 2, § 23.-10(b). Moreover, the local boards have their own funds. They can levy and collect taxes, *id.* § 23.27, and funds disbursed by the state to the districts become the property of the local board of trustees, which holds them in trust for the district; they cannot be taken away by the state. *Wright v. Houston Ind. School Dist.*, 393 F.Supp. 1149, 1155 (S.D.Tex.1975), *vacated and remanded on other grounds*, 569 F.2d 1383 (5th Cir. 1978); *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20, 26 (1931). Thus in addition to its independent legal powers, the GISD seems likely to have a mind of its own; we think it improbable that its litigation will be controlled by the state authorities to any significant extent. We conclude, then, that GISD is sufficiently independent of the state of Texas to bring this suit.

This conclusion is supported, by analogy, by two recent Supreme Court decisions. In these decisions, the Court relied heavily on the premise that the actions of a school district are not to be treated as if they were the direct actions of the state. In other words, the school district and the state were to be treated as separate entities.

In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Supreme Court upheld Texas's system of financing public education. Under that system a substantial portion of each school district's expenditures is financed by an ad valorem property tax levied by the district. Because the property in some districts has a higher assessed value, there are wide disparities in per-pupil expenditures among the school districts. The Court rejected a number of constitutional challenges to these inequalities, among them the argument that "the Texas system is unconstitutional . . . because it allows . . . the quality of education to fluctuate on the basis of the fortuitous positioning of boundary lines of political subdivisions." 411 U.S. at 53, 93 S.Ct. at 1307. The Court said:

[A]ny scheme of local taxation—indeed the very existence of identifiable local governmental units—requires the establishment of jurisdictional boundaries that are inevitably arbitrary. It is equally inevitable that some localities are going to be blessed with more taxable assets than others. . . .

*Id.* at 53–54, 93 S.Ct. at 1307; *see McGowan v. Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *cf. Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, 707–09 (1962), (Clark, J., concurring) (inequalities in legislative apportionment unconstitutional because unrelated to any coherent theory of representing local units of government); *Mahan v. Howell*, 410 U.S. 315, 325–26, 93 S.Ct. 979, 985, 35 L.Ed.2d 320 (1973) ("maintaining the integrity of political subdivision lines" justifies significant deviation from equality in apportionment of state legislature). It seems likely, however, that the Court accepted these disparities only because they resulted from an established system in which each school district regulated some of its own affairs. In other words, if there were no school districts and the state itself assessed and collected all taxes and then directly financed all public education in such a highly disparate fashion—in which expenditures varied not just according to various residents' willingness to tax themselves but according to the value of neighboring property—we strongly suspect that the Court would not have accepted the disparities. If we are correct, then the *Rodriguez* Court was refusing to treat the actions of school districts as if they were the direct acts of the state itself.

*Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), also suggests that school districts' actions are not to be treated as if they were the direct acts of the state. *Milliken* held that a federal court's remedy for unconstitutional school segregation had to take account of school district lines drawn by the state.

Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a

cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district.

. . . . .

The [district] court's analytical starting point was its conclusion that school district lines are no more than arbitrary lines on a map drawn "for political convenience." . . . [This] notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country.

*Id.* at 744–45, 741, 94 S.Ct. at 3125, 3127.

*Milliken* did not, however, suggest that a state might insulate itself from a decree remedying its own constitutional violations merely by drawing "arbitrary lines on a map," *see* 418 U.S. at 741, 94 S.Ct. at 3125. Rather, the *Milliken* Court emphasized that school districts are traditional units of local government, *see* 418 U.S. at 741–42, 94 S.Ct. at 3125–3126, with a variety of functions, *see id.* at 742, 94 S.Ct. at 3126, n. 20, and subject to local control, *see id.* at 742, 94 S.Ct. at 3126, and suggested that for these reasons a school district's violations were to be attributed only to it and not to the state. *See id.* at 770, 777–79, 94 S.Ct. at 3139, 3143–44 (White, J., dissenting). *Milliken* and *Rodriguez*, then, agree on a central principle: the actions of certain sorts of political subdivisions are not always to be treated as if they were the

direct acts of the state itself. It follows that the decision to sue Texas which was made by the GISD—a subdivision much like those involved in *Milliken* and *Rodriguez* [18]— was not a decision by the state to sue itself but the decision of a government that is treated, for at least some constitutional purposes, as an independent actor. Strictly as a matter of logic, it does not follow that the state and the school district are distinct entities for Article III purposes. But the analogy to *Rodriguez* and *Milliken* does support our conclusion that we are presented with a sufficiently live controversy under Article III.

Under the criteria normally governing standing to sue in federal court, then, GISD would be able to bring this suit against Texas.

### B.

█ Texas, however, cites a series of Supreme Court decisions which seem to hold that a municipality [19] cannot sue the state that created it. In some of these cases the state altered the municipality's boundaries or consolidated different municipalities; *Hunter v. Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907), is usually considered the leading example.[20] In other cases, of which *Trenton v. New Jersey*, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923) is typical, the state attempted to modify a grant or charter it had previously given to the municipality.[21] Invariably federal

---

18. *Rodriguez* was a suit against another independent school district in Texas, and Michigan school districts like the one involved in *Milliken* show many of the characteristics of Texas independent school districts. *Compare* 418 U.S. at 742, 94 S.Ct. at 3126 n. 20 with pp. 1065–66 *supra*.

19. For purposes of this analysis, the Garland Independent School District may be treated as a municipality, *cf. Harkless v. Sweeny Ind. School Dist.*, 427 F.2d 319, 321 (5th Cir. 1970), *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971) (school district is to be treated as municipality for purposes of susceptibility to suit under 42 U.S.C. § 1983), because the reasoning of the cases cited by Texas applies to all political subdivisions created by a state.

20. *See e. g., Williams v. Eggleston*, 170 U.S. 304, 18 S.Ct. 617, 42 L.Ed. 1047 (1898); *Town of Mt. Pleasant v. Beckwith*, 100 U.S. 514, 525, 25 L.Ed. 699, 701 (1880); *Comm'rs of Laramie County v. Comm'rs of Albany County*, 92 U.S. 307, 23 L.Ed. 552 (1876); *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1254–55 (5th Cir. 1976).

21. *See, e. g., Pawhuska v. Pawhuska Oil Co.*, 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054 (1919); *New Orleans v. New Orleans Waterworks Co.*, 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943 (1891); *East Hartford v. Hartford Bridge Co.*, 13 L.Ed. 518, 10 How. 511 (1850). *See also Williams v. Mayor of Baltimore*, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *Worchester v. Street Ry. Co.*, 25 S.Ct. 327, 49 L.Ed. 591 (1905).

courts have ruled against the municipality's claim that the state actions violated the municipality's rights under the contract clause, *see, e. g., Railroad Comm'n v. Los Angeles R.R.,* 280 U.S. 145, 156, 50 S.Ct. 71, 74 L.Ed. 234 (1929); *Hunter v. Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907); *City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1254–55 (5th Cir. 1976) or the just compensation clause, *see, e. g., City of Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923), or the due process, *see, e. g., id.; Northwestern School Dist. v. Pittenger,* 397 F.Supp. 975, 979 (W.D.Pa.1975), or equal protection clauses, *see, e. g. Williams v. Mayor of Baltimore,* 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *City of Newark v. New Jersey,* 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923); *Williams v. Eggleston,* 170 U.S. 304, 18 S.Ct. 617, 42 L.Ed. 1047 (1898). *See also Risty v. Chicago, R. I. & Pac. R.R.,* 270 U.S. 378, 46 S.Ct. 236, 241, 70 L.Ed. 641 (1926); (fourteenth amendment); *City of New York v. Richardson,* 473 F.2d 923, 929 (2d Cir.), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973) (various constitutional claims). While these cases do not always speak of standing, the Supreme Court has said that "[b]eing but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator." *Coleman v. Miller,* 307 U.S. 433, 441, 59 S.Ct. 972, 976, 83 L.Ed. 1385 (1939). And these decisions are frequently said to establish that a municipality has no standing to sue the state that created it. *See, e. g., Aguayo v. Richardson,* 473 F.2d 1090, 1100 (2d Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974); P. Bator et al., Hart and Wechsler's The Federal Courts and the Federal System (2d ed.) 182 (1973). Some of the language in the opinions is indeed broad enough to support this interpretation. *See, e. g., Williams v. Mayor of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immuni-

ties under the Federal Constitution which it may invoke in opposition to the will of its creator."); *City of Trenton v. New Jersey,* 262 U.S. 182, 187, 43 S.Ct. 534, 537, 67 L.Ed. 937 (1923) ("[A] municipality is merely a department of the state, and the state may withhold, grant or withdraw powers or privileges as it sees fit. However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will."). *See also Hunter v. Pittsburgh,* 207 U.S. 161, 178–79, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

We believe, however, that these decisions, properly interpreted, do not require us to deny GISD standing in this case. The Supreme Court itself said, in a somewhat different context from that facing us here, that "a correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases." *Gomillion v. Lightfoot,* 364 U.S. 339, 344, 81 S.Ct. 125, 128, 5 L.Ed.2d 110 (1960). We agree. We think these cases are substantive interpretations of the constitutional provisions involved; we do not think they hold that a municipality never has standing to sue the state of which it is a creature. In fact, correctly interpreted, these cases do not deal with "standing," in the sense in which we use the term, at all. We reach these conclusions for several reasons.

The *Hunter* and *Trenton* line of cases are descendents of *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). That great case prohibited New Hampshire from modifying a charter that the colonial government had issued to Dartmouth College. Applying the contract clause to the charters and grants of a government, however, created a serious problem; many state actions might be said to be contracts with those who benefitted from them, and a state barred from impair-

ing any such contract would be practically unable to legislate in large, important areas.

> [T]he word "contract," in its broadest sense, would comprehend the political relations between the government and its citizens, would extend . . . to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary legislation.

*Id.* 17 U.S. (4 Wheat.) at 627, 4 L.Ed. at 657. Such an interpretation of the contract clause, said Chief Justice Marshall, writing for the Court, "would be an unprofitable and vexatious interference with the internal concerns of a state," and would be "unnecessary, . . . mischievous, and . . . repugnant to [the] general spirit" of the Constitution. *Id.*

To solve this problem the *Dartmouth College* Court distinguished between two types of state actions. The contract clause applied to grants of "private" powers, or grants to private institutions. Allocations and regulations of "political" powers, however, were exempt from the contract clause. 17 U.S. (4 Wheat.) at 630, 629, 4 L.Ed. at 657. And while *Dartmouth College* itself dealt with the contract clause alone, Chief Justice Marshall's reasoning was broader; he erected the general principle that the entire Constitution does not interfere in a state's internal organization of its political functions.

> [T]he framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and . . . the instrument they have given us is not to be so construed.
>
> .    .    .    .    .
>
> If the act . . . be a grant of political power, if it create a civil institution to be employed in the administration of government . . . the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.

17 U.S. (4 Wheat.) at 629–630, 4 L.Ed. at 657.

As we read them, the *Hunter* and *Trenton* line of cases are simply faithful to this principle of *Dartmouth College*. They hold that the Constitution does not interfere in the internal political organization of states. Decisions in the *Hunter* and *Trenton* line dealing with claims under the equal protection or due process clauses, *see* pp. 1067–68 *supra*, extend this principle to the fourteenth amendment. In some respects the Court has retreated from this absolute position, *see, e. g. Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *id.* at 128–29 (citing cases), but these retreats are not our present concern. Our point is that *Hunter, Trenton,* and allied cases are substantive holdings that the Constitution does not interfere in states' internal political organization. They are not decisions about a municipality's standing to sue its state.

*Hunter* itself confirms our view; it continues the *Dartmouth College* distinction between allocations of political or public powers, on the one hand, and allocations of private powers, on the other. After a classic description of the unlimited power of states over municipalities, the *Hunter* Court said:

> It will be observed that, in describing the absolute power of the state over the property of municipal corporations, we have not extended it beyond the property held and used for governmental purposes. Such corporations are sometimes authorized to hold and do hold property for the same purposes that property is held by private corporations or individuals. . . it has been held that, as to the latter class of property, the legislature is not omnipotent.

28 S.Ct. at 47. *See also City of Trenton v. New Jersey*, 262 U.S. 182, 43 S.Ct. 534, 537–38, 67 L.Ed. 937 (1923). The Court went on to acknowledge, implicitly, that a municipality could raise the claim that its "private" contract and property rights had

been impaired. *Id.*[22] This acknowledgement is, of course, flatly inconsistent with the position that a municipality can never sue the state that created it.

The opinions in the *Hunter* and *Trenton* line do occasionally—but by no means uniformly—speak of "standing," and deny that a municipality has "standing" to sue the state. But when those cases were decided, "standing" generally meant something somewhat different from what it means today. A party had standing—or a "right to sue"—if it was correct in its claim on the merits that the statutory or constitutional provision in question protected its interests; standing was not seen as a preliminary or threshold question. *See, e. g. Tennessee Electric Power Co. v. TVA*, 306 U.S. 118, 139–40, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Ashwander v. TVA*, 297 U.S. 288, 343, 56 S.Ct. 466, 481, 80 L.Ed. 688 (1936) (Brandeis, J., dissenting); Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claims for Relief, 83 Yale L.J. 425, 427–42 (1974). In speaking of "standing," cases in the *Hunter* and *Trenton* line meant only that, on the merits, the municipality had no rights under the particular constitutional provisions it invoked. This is why the *Hunter* and *Trenton* series of cases did not mention the criteria we now associate with inquiries into standing—the extent of an actual injury and of a genuine case or controversy, for example. When we applied these criteria, *see* pp. 1060–67, *supra*, we found no bar to conferring standing on GISD in this case.

The *Hunter* and *Trenton* cases, then, do not deal with standing; they adhere to the substantive principle that the Constitution does not interfere with a state's internal political organization. This principle is not relevant to the case before us. GISD's claim is that *Congress*, exercising its power under Article I, has interfered with Texas's internal political organization, at least to the extent of allowing a school district to ignore the state's mandate and to decide for itself whether to accept the breakfast program. There is every reason to think that Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere; the Supreme Court has never said otherwise. *See City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir.) *cert. denied*, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973); *NAACP v. Wilmington Medical Center, Inc.*, 426 F.Supp. 919, 926 n.1 (D.Del.1977); *Triplett v. Tiemann*, 302 F.Supp. 1244 (D.Nev.1969). The Court has, to be sure, limited Congress's power in a way faintly analogous to the *Dartmouth College* distinction between private and governmental powers; it has held that Congress may not "impermissibly interfere with the integral governmental functions" of states and their subdivisions. *National League of Cities v. Usery*, 426 U.S. 833, 851, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976). It is unclear whether this limitation ever applies to an act of Congress which, like the breakfast program, does not necessarily require anything of the states or their subdivisions but only offers funds to states or subdivisions which comply with certain conditions.[23] Our decision on the merits, *see* Part III *infra*, makes it unnecessary to discuss whether this limit on Congress's power would keep it from doing what GISD claims it has done, *cf. Public Utility Dist. No. 1 v. FPC*, 113 U.S.App.D.C. 363, 366–68, 308 F.2d 318, 321–23 (1962), *cert. denied*, 372 U.S. 908, 83 S.Ct. 719, 9 L.Ed.2d 716 (1963) (FPC may empower municipality to condemn land despite state statute prohibiting municipality from doing so); *Alabama NAACP State Conference of Branches v. Wallace*, 269 F.Supp. 346 (M.D.

---

22. More recently the Supreme Court has intimated that this distinction between the public and private rights of a municipality is not extinct. *See Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 128, 5 L.Ed.2d 110 (1960).

23. In *Massachusetts v. Mellon*, 262 U.S. 447, 482, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Supreme Court held that a state may not challenge such an optional federal spending program, partly because "the statute [does not] require the states to do or to yield anything. If Congress enacted it with the ulterior purpose of tempting them to yield, that purpose may be effectively frustrated by the simple expedient of not yielding." 43 S.Ct. at 599.

Ala.1967) (declaring unconstitutional a state statute prohibiting localities from obtaining federal money by complying with federal desegregation guidelines), for we hold that GISD is incorrect in asserting that Congress has empowered school districts to decide for themselves whether to accept the breakfast program. But in any event these are substantive limits on Congress's power. They are not material to our inquiry into GISD's standing. We conclude that the *Hunter* and *Trenton* line of cases do not, properly speaking, deal with a municipality's standing to sue the state that created it. Therefore they do not deny GISD standing to bring this suit.

### III.

GISD contends that § 21.914 is inconsistent with the federal school breakfast statutes and regulations and therefore unconstitutional under the supremacy clause. For the most part, GISD relies on a section of the principal statute establishing the breakfast program and on one of the regulations. The statute, 42 U.S.C. § 1773(a), provides in part:

> There is hereby authorized to be appropriated such sums as are necessary to . . . assist the States through grants-in-aid and other means to initiate, maintain, or expand nonprofit breakfast programs *in all schools which make application for assistance* and agree to carry out a nonprofit breakfast program in accordance with this chapter.

(emphasis added). The regulation, 7 C.F.R. § 220.7(a), says that "The School Food Authority shall make written application to the state agency . . . for any school in which it desires to operate the School Breakfast Program . . . ." The "School Food Authority" is defined as "the governing body which is responsible for the administration of one or more schools and which has legal authority to operate a breakfast program therein." 7 C.F.R. § 220.2(w). GISD argues in effect that the phrase "in all schools which make application for assistance" in § 1773(a) implies that no school which has not applied shall have the program forced on it. And GISD of course argues that the School Food Authority is the school board, and that § 220.7(a) expressly gives it the power to decide whether to accept the breakfast program.

These texts alone do not settle the issue. Section 1773(a) says "schools," not "school boards," and GISD does not seem to contend that each individual school can decide to reject the program.[24] In any event, this interpretation of the statute would make the very regulation GISD relies on illegal. Moreover, the same sentence speaks of "assist[ing] the States," suggesting that the states have primary responsibility over the breakfast program.

In fact, the legislative history indicates that this portion of § 1773(a) has nothing to do with specifying the local body which is to decide whether to participate. The earlier version of the first sentence of § 1773(a) had read:

> "There is hereby authorized to be appropriated for each of the fiscal years 1972 and 1973 not to exceed $25,000,000 to carry out a program to assist the States through grants-in-aid and other means to initiate, maintain, or expand nonprofit breakfast programs in schools."

*See* 42 U.S.C.S. § 1773. This was a limited authorization; it provided funds for the program in only some of the schools that wanted to participate. In 1972 Congress decided to authorize enough funds to provide breakfasts in every school that wanted to participate. *See* S.Rep. No. 92–1027, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 3380, 3392. Not unnaturally, it said so by rewriting the statute to authorize "such sums as are necessary [to fund the program] in all schools which make application . . . ." There is no indication that Congress intended to change § 1773(a) from an authorization of funds into a provision dealing with the rela-

---

24. One federal court has rejected this interpretation of the statute. *See Torres v. Butz*, 397 F.Supp. 1015 (N.D.Ill.1975).

tive powers of states and local school boards.

The regulation cited by GISD, 7 C.F.R. § 220.7(a), similarly is not dispositive. It may just be a traffic control device specifying the agency that is to handle paperwork connected with the application. See *id.; id.* § 220.7(b) (administrative responsibilities associated with application). Moreover, a "School Food Authority" is defined as the body "which has legal authority to operate a breakfast program." 7 C.F.R. § 220.2(w). Presumably it is state law which defines the legal authority of various local bodies; by enacting § 21.914 Texas has removed from GISD the legal authority to decide whether to participate in the program. Of course, § 1773(a) and 7 C.F.R. § 220.7(a) lend no support to Texas's argument that the federal program permits statutes like § 21.914, but they do not decide the case in GISD's favor either. They leave the question open.

We must, therefore, examine the statutory and regulatory scheme, and the legislative history, in an effort to answer two questions. First, in establishing the federal breakfast program, did Congress indicate any general distrust of state governments? That is, did Congress seem to believe that decisions made by local school boards would, in general, better effectuate the policies of the program? And second, even if Congress expressed no *general* reluctance to allow state governments to make decisions about the breakfast program, does this particular Texas statute, mandating breakfast programs in schools with a substantial number of children from poorer families, clash with any specific congressional policy?

There are few signs that Congress and the Department of Agriculture generally distrusted state governments; indeed the evidence is rather that Congress wanted to involve the states fully in the administration of the program. The state educational agencies receive the local authorities' applications, 42 U.S.C. § 1773(a), and enter into contracts with local schools or school districts to run the program, 7 C.F.R. § 220.-7(a). Subject to the federal guidelines, the state authorities can set the rates at which school districts will be reimbursed. 7 C.F.R. § 220.9. They decide which school districts will receive additional payments if the uniform national rates of reimbursement do not cover all their costs. 42 U.S.C. § 1773(d); 7 C.F.R. § 220.9(c). Under an earlier version of the breakfast program, when only limited funds were authorized, states could select—according to certain federal criteria—the schools that would be permitted to participate in the programs; now states can, at least, still choose which schools to reimburse if appropriated funds are insufficient to reimburse all the schools that want to participate. *See* 42 U.S.C. § 1773(c). All of these tasks require the state to make important and potentially controversial decisions. Congress would not have assigned them to the states if it distrusted the states, wanted to insulate local school boards from the states' mandates, or thought that local boards' decisions were singularly likely to further the policies of the program.[25]

Finally, § 21.914 itself seems quite consistent with the policies of the federal breakfast program. In many ways, Congress made clear its desire to expand the program generally. Perhaps even clearer is Congress's particular concern that as many poor children as possible be served free or reduced-price breakfasts.[26]

The policy in favor of expanding the program is made explicit in 42 U.S.C. § 1773(g), which provides:

---

**25.** The legislative history contains several suggestions that states, as well as localities, should be closely involved in the program. *See, e. g.,* House Rep. No. 1802, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin. News, pp. 3180, 3180, 3182, 3187. There are even indications that Congress envisioned that the states would decide whether to participate. *See, e. g., id.* at 3182; House Rep. No. 91–81,

91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Admin.News, pp. 3014, 3019 (Additional Views of William A. Steiger of Wisconsin).

**26.** It follows, of course, that our decision does not suggest that a state could constitutionally require a school or school board to *reject* the breakfast program.

As a national nutrition and health policy, it is the purpose and intent of Congress that the school breakfast program be made available in all schools where it is needed to provide adequate nutrition . . . .

In addition, participating states are required to submit to the Secretary of Agriculture, annually, a plan demonstrating their intention "to use the funds provided under [the school breakfast program] . . to the maximum extent practicable to reach needy children." 42 U.S.C. § 1759a(e)(1)(C). The regulations specify that "state agencies have a positive obligation . . . to extend the benefits of the School Breakfast Program to children attending schools where poor economic conditions exist." 7 C.F.R. § 220.7(c). Arguably, these provisions themselves authorize state statutes like Texas's § 21.914, requiring school districts with a high percentage of poorer children to participate; in any event, they reveal Congress's hospitality to such state statutes. In the past, when Congress did not authorize enough funds to reimburse every school that wanted to participate in the program, it made its concern with reaching poor children even more explicit; in selecting the schools that would participate, states were to give priority to schools with children from poorer areas, *see* 42 U.S.C. § 1773(c), and to schools in which "there is a special need for improving the nutrition and dietary practices of children of working mothers and children from low-income families." *Id.* Now that Congress has authorized funds sufficient to cover all schools that want to participate, *see* p. 1072 *supra*, these priorities are less important, although they still govern states' decisions about which schools to reimburse when appropriations fall short. But there is no reason to think that Congress has retreated from the concern for reaching the poor demonstrated by those priority provisions.

Congress was not coy about its ambitions for the federal breakfast program. It wanted "to meet more effectively the nutritional needs of our children," and "to safeguard the health and well-being of the Nation's children," 42 U.S.C. § 1771, particu-

larly those children who, because of their family's poverty or for some other reason, are inadequately fed. To this end Congress wanted the program to expand and to reach every school where it is needed. In § 21.914 Texas has tried to bring Congress's plan to fruition; it has been faithful to Congress's intentions. We do not agree with GISD that such fidelity is outlawed by the program itself. In this context we cannot accept GISD's pretension to be a rulemaker instead of just a housekeeper, for GISD's claim would take the starch out of the breakfast program.

For all of these reasons, we think that Congress—in addition to trusting the states generally, and not wanting to limit their control over the breakfast program—particularly favored state efforts to expand the program to reach poorer children. The federal breakfast program, and the policies underlying it, are entirely compatible with Texas's § 21.914. The district court was correct to hold that § 21.914 is constitutional. Its judgment is

AFFIRMED.