**PALOMAR POMERADO HEALTH SYSTEM, a Health Care District, Plaintiff–Appellant,**

v.

**Kimberly BELSHE; Dieter Merkle; Curtis Cotton,[1] Defendants–Appellees.**

No. 98–15794.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 12, 1999.

Decided June 29, 1999.

---

1. Defendant Belshe is the Director of the California Department of Health Services. Defendants Merkle and Cotton are auditors employed by the department.

Patric Hooper, Hooper, Lundy & Bookman, Los Angeles, California, for plaintiff-appellant.

Marsha Ann Bedwell, Deputy Attorney General, Sacramento, California, for defendants-appellees.

Before: LAY,[2] PREGERSON, and HAWKINS, Circuit Judges.

Opinion by Judge PREGERSON; Concurrence by Judge HAWKINS.

PREGERSON, Circuit Judge:

This action arises out of a California Department of Health Services ("DHS") audit of Plaintiff Palomar Pomerado Health System's billing practices.

DHS asks us to decide whether a health care district created by the State of California has standing to sue the state in a federal court to challenge the validity of state regulations on federal constitutional grounds. We answer in the negative.

2. The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

## I.

Palomar Pomerado is a health care district formed under California law. It provides long-term health care services at two "distinct part nursing facilities"[3] in San Diego County, California. Palomar Pomerado provides services to privately insured patients, Medi–Cal patients, and uninsured patients who pay on their own.

In April 1994, Palomar Pomerado switched from a billing system based on the level of care the patient required to a "flat rate" system based on the type of room the patient occupied. At the same time, Palomar Pomerado introduced a "prompt pay discount" for patients who paid privately or who were privately insured. Palomar Pomerado does not offer the discount to Medi–Cal. Under the prompt pay discount policy, patients who paid their bills within thirty days receive a fifty percent discount.

The Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A) (repealed by Pub.L. No. 105–33, § 4711(a), 111 Stat. 251, 507–08 (1997)), requires states to reimburse providers such as Palomar Pomerado at a rate that is "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." In California, reimbursement is governed by Title 22, California Code of Regulations, section 51511(a)(2). Section 51511(a)(2) provides that the per diem reimbursement rate for distinct part nursing facilities such as Palomar Pomerado "shall be the lesser of the facility's costs as projected by [DHS] or $214.90."

A separate California regulation prohibits providers such as Palomar Pomerado from submitting "claim[s] for reimbursement for the rendering of health care services to a Medi–Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general

public for the same service." 22 C.C.R. § 51480(a). DHS enforces section 51480(a) through annual audits. Following an audit for Fiscal Year Ending ("FYE") June 30, 1994, DHS found that the discounted rate under the "prompt pay" program was Palomar Pomerado's "usual fee" and concluded that Palomar Pomerado had overcharged the state by $558,000 for the period between April 1, 1994 and June 30, 1994. Accordingly, DHS brought an administrative recoupment action. Palomar Pomerado filed an administrative appeal on grounds separate from those Palomar Pomerado raises here.[4] Since the FYE June 30, 1994 audit, DHS has continued to enforce 22 C.C.R. § 51480(a) against Palomar Pomerado.

On February 24, 1997, Palomar Pomerado brought this action against DHS to permanently enjoin defendants and their agents "from reducing the Medi–Cal payment rates owing to Palomar Pomerado for distinct part skilled nursing facilities services furnished to Medi–Cal patients below the rates required to be paid under . . . federal Medicaid law, including enjoining them from reducing reimbursement to the discounted [rates]" charged under the prompt pay program to patients who pay privately or who are insured privately. Palomar Pomerado also sought "an order declaring the practice and policy of [DHS] . . . to be in violation of the federal Medicaid law and regulations and the United States Constitution," and "an order declaring that plaintiff is entitled to provide a prompt-pay discount to its private-pay patients without jeopardizing its right to receive Medi–Cal payments [from the state] at the rates . . . contained in 22 CCR Section 51511." Palomar Pomerado also sought reimbursement for the costs of its action and for its attorneys' fees.

---

**3.** A "distinct part nursing facility" operates as a distinct part of a hospital as opposed to a freestanding nursing facility which is not part of a hospital. Palomar Pomerado's two distinct part facilities are Palomar Continuing Care Center, a distinct part of Palomar Medi- cal Center, and Villa Pomerado, a distinct part of Pomerado Hospital.

**4.** Palomar's administrative appeal was decided on April 26, 1999.

On September 5, 1997, DHS moved for summary judgment. On March 30, 1998, the district court determined that DHS's practices were consistent with the Boren Amendment, and that DHS had not violated Palomar Pomerado's due process rights. Accordingly, the district court granted DHS's motion for summary judgment. Palomar Pomerado appeals. We dismiss for lack of standing.

## II.

On appeal, DHS argues for the first time that Palomar Pomerado, as a political subdivision of the state, has no standing to sue the state in federal court to challenge the validity of state regulations as violative of the Due Process Clause, U.S. Const. amend. XIV, or the Supremacy Clause, U.S. Const. art. VI, cl. 2.

■ It is well-settled that "[s]tanding is a necessary element of federal-court jurisdiction." *City of South Lake Tahoe v. California Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233 (9th Cir.1980) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). This jurisdictional issue is not waived because it was not raised in the district court. *See South Lake Tahoe*, 625 F.2d at 233 ("Although the district court passed over the standing issue we must consider it because it governs our jurisdiction as well.").

## A.

■ Under established Ninth Circuit law, "[p]olitical subdivisions of a state may not challenge the validity of a state statute" in a federal court on federal constitutional grounds. *Id.* (quoting *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir.1973)); *see also Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1363–64 (9th Cir. 1998) (holding that the rule of *South Lake Tahoe* applies to both Fourteenth Amendment and Supremacy Clause claims.) "This is true whether the defendant is the state itself or another of the state's political subdivisions." *South Lake Tahoe*, 625 F.2d at 233 (citations omitted).

Palomar Pomerado's claims are based on Fourteenth Amendment and Supremacy Clause grounds. We must determine (1) whether Palomar Pomerado is a "political subdivision" of the State of California, and if so, (2) whether, by suing the defendants named in this action, Palomar Pomerado brings this action against the state.

## B.

■ Palomar Pomerado is a health care district. It is a public corporation formed under California law. *See* Cal. Health & Safety Code § 32000 *et seq.* (Local Health Care District Law). Its powers are limited to those granted it by the state. *See* Cal. Health & Safety Code § 32001.

Among its powers, Palomar Pomerado may "establish, maintain, and operate" health facilities. *See* Cal. Health & Safety Code § 32121(j). To meet this end, Palomar Pomerado possesses and exercises limited governmental functions within a particular area of the state. For example, Palomar Pomerado possesses the power to levy taxes and issue bonds. *See* Cal. Health & Safety Code §§ 32200–32243, 32316–32321. It also has the power of eminent domain. *See* Cal. Health & Safety Code § 32121(d). As such, it is a "political subdivision" and an agency of the state. *See* 58 Cal. Jur.3d § 12 ("all public corporations exercising governmental functions within a limited portion of the state—counties, cities, reclamation districts, irrigation districts—are agencies of the state").

Such political subdivisions, like "[m]unicipal corporations[,] have generally been denied standing in the federal courts to attack state legislation as violative of the federal Constitution, on the ground that they have no rights against the state of which they are a creature." *Hart and Wechsler's The Federal Courts and The Federal System* 180 (Richard H. Fallon et al., eds.1996).

In sum, Palomar Pomerado is a creature of the state. Counsel for Palomar Pomer-

ado conceded at oral argument that the district continues to exist at the pleasure of the state, its legislature, and its citizens. Moreover, Palomar Pomerado's powers are limited to those granted by the state. *See* Cal. Health & Safety Code § 32001. Finally, as stated above, Palomar Pomerado possesses and exercises governmental functions. Accordingly, Palomar Pomerado is a "political subdivision" for purposes of the standing doctrine discussed in *South Lake Tahoe.*

## C.

■ Palomar Pomerado argues that we should not apply *South Lake Tahoe* because Palomar Pomerado brings this action against named state employees and not against the state. But as the following discussion indicates, Palomar Pomerado's action is in fact an action against the State of California.

■ " '[T]he general rule is that relief sought nominally against [a state] officer is in fact against the sovereign if the decree would operate against the latter.' " *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting *Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) (per curiam)); *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (an action is against the state "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act") (internal quotations omitted). Here, the purpose of the injunction and other orders Palomar Pomerado seeks is to "restrain the Government" from reducing the Medi–Cal payment rates charged by Palomar Pomerado to the discounted rates offered patients who pay privately or who are privately insured. The result Palomar Pomerado seeks would "interfere with the public administration." As such, Palomar Pomerado's action falls under the category of actions against state officials that are in fact actions against the state.

*Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), provides an exception to the "general rule" set out above. Assuming that Palomar Pomerado could establish standing, the fact that it is suing defendants in their individual capacities would allow it to invoke *Ex parte Young* to circumvent the state's Eleventh Amendment immunity. *See id.* at 155–56, 28 S.Ct. 441. But *Ex parte Young* does not provide Palomar Pomerado with standing to sue in federal court. *Young* only provides "a narrow exception *to Eleventh Amendment immunity* for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities." *Rounds v. Oregon State Bd. of Higher Educ.,* 166 F.3d 1032, 1036 (9th Cir.1999) (emphasis added); *see also Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836, 839 (9th Cir.1997) (*Young* "provides a narrow ... exception to *Eleventh Amendment immunity* ") (emphasis added).

## III.

Palomar Pomerado is a political subdivision of the State of California. As such, it lacks standing to bring an action against the state in federal court—at least to the extent that its action challenges the validity of state regulations on due process and Supremacy Clause grounds. *See South Lake Tahoe,* 625 F.2d at 233–34 ("Because all of its claims are based on the [federal] Constitution, the City's challenge was properly dismissed [on standing grounds].").

Because Palomar Pomerado lacks standing, the federal courts are without jurisdiction over this action. *See id.* at 233. Accordingly, this appeal is DISMISSED, and the decision of the district court is VACATED.

MICHAEL DALY HAWKINS, Circuit Judge, concurring:

The majority is undoubtedly correct in applying current circuit law, especially the way in which *City of South Lake Tahoe v.*

*California Tahoe Reg'l Planning Agency,* 625 F.2d 231 (9th Cir.1980), has been subsequently interpreted. *See Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank,* 136 F.3d 1360 (9th Cir.1998). Because the current law in this circuit calls for a ban on *any* constitutional challenge by a political subdivision against its "parent state"—an interpretation at odds with at least three other circuits—I believe our en banc court should take another look at *South Lake Tahoe* and its progeny.

*South Lake Tahoe* cited a long list of cases to support the statement that "[a] City may not challenge [a state agency's] plans and ordinances on constitutional grounds." However, none of the cited cases involved a Supremacy Clause challenge (at issue in *South Lake Tahoe*); rather, they addressed Fourteenth Amendment or Contract Clause challenges. *Burbank–Glendale–Pasadena Airport Authority v. City of Burbank,* 136 F.3d 1360 (9th Cir.1998), simply relied on *South Lake Tahoe.* We have thus never satisfactorily stated our rationale for including all constitutional challenges within the ban.

On the other hand, circuits that have rejected a "per se" rule against all constitutional challenges have provided convincing reasons for doing so. In *Rogers v. Brockette,* 588 F.2d 1057 (5th Cir.1979), the Fifth Circuit traced the history of cases denying standing to political subdivisions that sued their parent states. The court focussed on the foundational Supreme Court cases which dealt with municipalities' rights under the Contract Clause, the Just Compensation Clause, and Equal Protection. *See, e.g., Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *Hunter v. City of Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

In these cases, the Court's primary concern was that a state whose relations with its municipalities were bound by the broad constitutional principles that govern its re-lations with private parties would be practically unable to legislate. *See Rogers,* 588 F.2d at 1068–69. Although the cases spoke in terms of standing, they are more accurately described as "substantive holdings that the Constitution does not interfere in states' internal political organization." *Id.* at 1069 (noting that "standing" had a different meaning when *Hunter,* etc. were decided). Not every constitutional provision presents the danger of such interference. *Rogers* concluded that where a municipality alleged a violation of federal law under the Supremacy Clause, it was Congress, not the Constitution, that was interfering in the states' internal political organization.

The Tenth Circuit has also interpreted the early Supreme Court cases more narrowly, describing them as "stand[ing] only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Branson Sch. Dist. RE–82 v. Romer,* 161 F.3d 619, 628 (10th Cir.1998). Challenges based on the latter category of rights, the Tenth Circuit reasoned, do not raise the spectre of the "chaos" of lawsuits generated by "mere disagreement by a political subdivision with the policies of its parent state." *Id.* at 630. The *Branson* court thus allowed a school district to invoke the Supremacy Clause against its parent state for violation of a federal law.

Indeed, the Supreme Court has itself indicated that its rule does not apply equally to all constitutional challenges. In *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), a case that did not directly present the issue of a municipality's standing to sue, the Court had opportunity to interpret the *Hunter* line of cases, and stated:

> [A] correct reading of the seemingly unconfined dicta of Hunter and kindred cases is not that the State has plenary

power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained *by the particular prohibitions of the Constitution considered in those cases.*

*Gomillion,* 364 U.S. at 344, 81 S.Ct. 125 (emphasis added). When the Supreme Court denied certiorari in *South Lake Tahoe,* Justice White dissented on the grounds that a per se rule was inconsistent with *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), a case in which a local board of education challenged the constitutionality of a state statute on First Amendment grounds. *See City of South Lake Tahoe v. California Tahoe Reg'l Planning Agency,* 449 U.S. 1039, 1042, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980) (White, J., dissenting from denial of certiorari).

The Fifth and Tenth Circuits have noted another apparent limitation on the breadth of the rule, this one stemming from the nature of the political subdivision rather than the nature of the constitutional provision. In one of its earliest cases on the subject, the Supreme Court made the following observation:

It will be observed that, in describing the absolute power of the state over the property of municipal corporations, we have not extended it beyond the property held and used for governmental purposes. Such corporations are sometimes authorized to hold and do hold property for the same purposes that property is held by private corporations or individuals. The distinction between property owned by municipal corporations in their public and governmental capacity and that owned by them in their private capacity, though difficult to determine, has been approved by many of the state courts, and it has been held that, as to the latter class of property, the legislature is not omnipotent.

*Hunter* at 179, 28 S.Ct. 40 (*quoted in Rogers,* 588 F.2d at 1069). Relatedly, in *Lassen v. Arizona ex rel. Arizona Highway Dep't,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), the Court stated, "This action is in form and substance a controversy between two agencies of the State of Arizona.... We have nonetheless concluded that this is a case with which we may properly deal. The Land Commissioner is apparently a substantially independent state officer, appointed for a term of years and removable only for cause. He is essentially the trustee of the trust at issue here, with custody of the trust lands." *Id.* at 460 n. 1, 87 S.Ct. 584 (*quoted in Branson,* 161 F.3d at 629). In short, the Court has recognized a difference between political subdivisions acting in their governmental roles and political subdivisions acting in a private or substantially independent capacity. The latter may be able to sue the state in situations where the former could not.

The Fifth and Tenth Circuits are joined by the Eleventh Circuit in expressly rejecting a per se rule. *See United States v. Alabama,* 791 F.2d 1450, 1455 (11th Cir. 1986). Other circuits have suggested, without holding, that they do not favor such a rule. *See City of Charleston v. Public Serv. Comm.,* 57 F.3d 385, 389–90 (4th Cir.1995) (noting that a political subdivision's standing regarding a non-Fourteenth Amendment claim was "unclear" and proceeding to resolve the issue on the merits); *South Macomb Disposal Auth. v. Township of Washington,* 790 F.2d 500, 504 (6th Cir.1986) (noting that "[t]here may be occasions in which a political subdivision is not prevented, by virtue of its status as a subdivision of the state, from challenging the constitutionality of state legislation"). Certainly the Ninth Circuit is alone in having barred Supremacy Clause challenges by political subdivisions against their parent states.

The existence of a contrary view in other circuits does not automatically suggest a need to reexamine our own position. However, where the other circuits' view is well and thoroughly reasoned, we should at least satisfy ourselves that our position is grounded in an equally solid rationale.

I therefore suggest that we revisit *South Lake Tahoe*'s holding en banc.