291 F.3d 1161
 OKANOGAN SCHOOL DISTRICT # 105; Omak School District # 19; Republic School District # 309; Oroville School District # 410; Tonasket School District # 404; Quillayute Valley School District # 402; Nespelem School District # 14; Stephen Kunkel; Marile Kunkel, individually and as guardians of Karen Kunkel, William Kunkel, Frank Kunkel, and Benjamin Kunkel; Methow Valley School District # 350, Plaintiffs-Appellants, and
Cusick School District # 59; Wenatchee School District # 246; Newport School District # 56; White Salmon Valley School District # 405; Cascade School District # 228; North Beach School District # 64; Kettle Falls School District # 212; Entiat School District # 127; Hoquiam School District # 28; Sedro Woolley School District # 101; Okanogan County, a Washington municipal corporation, Plaintiffs,
v.
SUPERINTENDENT OF PUBLIC INSTRUCTION FOR THE STATE OF WASHINGTON; Treasurer for the State of Washington, Defendants-Appellees.
 No. 00-36096.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 9, 2002.
 Filed June 3, 2002.
 
 Jeffrey L. Fisher, Davis Wright Tremaine LLP, Seattle, WA, for the plaintiffs-appellants.
 David A. Stolier, Assistant Attorney General, Olympia, WA, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-99-05654-RJB.
 Before RYMER, McKEOWN, and GOULD, Circuit Judges.
 OPINION
 RYMER, Circuit Judge.
 
 
 1
 Since 1908 the federal government has paid states, such as Washington, twenty-five percent of all moneys received from national forests within their borders to be spent as the state legislature prescribes for the benefit of public schools and public roads of counties in which a national forest is situated. 16 U.S.C. § 500. Washington distributes these funds to forest land counties, but has decided that forest land counties must disburse half of the money directly to school districts. The state then credits the amount of that disbursement toward the amount of state-mandated aid (called the basic education allocation, or BEA) that would otherwise be paid to the districts. Wash. Rev.Code § 28A.520.020.
 
 
 2
 Parents of children who attend the public schools in a forest land county and a number of school districts seek through this action under 42 U.S.C. § 1983 to restrain the Washington Superintendent of Public Instruction and the State Treasurer from reducing the districts' BEA in this way. They seek an order requiring them instead to pay school districts in forest land counties their full allocation of forest funds and their full basic education allocation. The district court held that neither the parents nor school districts have standing, and that the federal statute has not been violated in any event.
 
 
 3
 We agree that the school districts lack standing under City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231 (9th Cir.1980). School districts are a political subdivision of the state, and political subdivisions of a state may not challenge the validity of a state statute in federal court. Whether parents, in behalf of their children, have standing is a closer question. We conclude that they have sufficiently shown injury in fact, but that their ability to redress concerns about their children's education through the requested relief is problematic because the connection between § 500 and the quality of education delivered by any particular district is attenuated. In effect this leads us to the merits, for both standing and the merits in this case turn on the unique way that § 500 structures the distribution of aid. Section 500 provides that federal forest funds are to be paid to the state, not to school districts. The statute does not constrain how the state exercises its discretion in spending those funds for the benefit of schools or roads in forest land counties, or control how the state (or a school district) uses its own funds in relation to the forest funds. Thus, the district court correctly entered judgment for the Superintendent and Treasurer.
 
 
 4
 * Stephen and Marile Kunkel have four children who attend public school in the Okanogan School District.[1] The district is in a county that has forest land which belongs to the federal government. National forest property is not taxable by the county. Congress recognized the impact this would have on the ability of forest land counties to raise money for schools and roads, so it enacted § 500. See "The National Forest Management Act: Law of the Forest in the Year 2000," 21 J. Land Resources & Envtl. L. 151, 159 (2001). Section 500 provides:
 
 
 5
 [T]wenty-five per centum of all moneys received during any fiscal year from each national forest shall be paid, at the end of such year, by the Secretary of the Treasury to the State ... in which such national forest is situated, to be expended as the State ... legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which such national forest is situated: Provided, That when any national forest is in more than one State or Territory or county the distributive share to each from the proceeds of such forest shall be proportional to its area therein.
 
 
 6
 16 U.S.C. § 500 (West 2000) (emphasis in original).
 
 
 7
 Washington has established a federal forest fund revolving account into which the treasurer deposits forest revenues for eligible counties. Wash. Rev.Code § 28A.520.020. Fifty percent of each forest land county's share is disbursed directly to the county to be spent as it chooses for public roads, public schools, or other public purposes authorized by federal law. This half is not at issue in this case. The other fifty percent goes through the county directly to school districts in the county, as authorized by the Superintendent of Public Instruction (SPI) according to a formula based on the number of full-time equivalent students in each district. It is this half about which the Kunkels and school districts complain.
 
 
 8
 Like all states, Washington's funding mechanism for public schools is complex. In broad strokes, each district is guaranteed a minimum level of funding through a general apportionment entitlement that pays for services and supports the district's basic education program. A district's "basic education allocation" is based on its annual average full-time equivalent enrollment and various adjustments, including forest fund revenues received by the district. If a district is in a forest land county and its forest fund revenues are less than its BEA, the Superintendent apportions to the district the difference between the district's forest fund share and the BEA to which it would otherwise be entitled. Wash. Rev.Code § 28A.520.020(3). The Kunkels and Okanogan assert that the SPI should not be allowed to reduce the district's BEA by the amount of forest funds the district receives, because doing so deprives Okanogan schools of § 500 funding that is meant to compensate for the county's loss of a large part of its taxable land base.
 
 
 9
 The BEA is the largest component of school financing in Washington, but school districts may also levy taxes for support of maintenance and operation (a general fund levy), transportation, and facilities if authorized by sixty percent of the voters in the district.[2] Wash. Rev.Code § 84.52.053; Wash. Const. Art. VII, § 2(a). The state supplements maintenance and operation levy money by local effort assistance funds to help equalize local tax levy burdens.[3] Wash. Rev.Code § 28A.500.010. Finally, the state provides enhanced funding for small school districts. Wash. Rev.Code § 28A.150.260(1)(e).
 
 
 10
 Approximately 84 percent of Okanogan School District's annual funding comes from the state of Washington, 10 percent from the federal government, and 6 percent from local property tax levies. In fiscal year 1998-99, Okanogan's funding totaled $7,560,989.76. The district received $91,378.47 in federal forest revenues, which was added to $3,743,136.03 of BEA. Okanogan also received $379,505.96 in local effort assistance funds from the state, and raised $375,487.06 in local property taxes. The district budgets these resources in five expenditure categories: the General Fund, which is for staff salaries and benefits, classroom supplies and materials; the Debt Service Fund, which is used to pay down previous bond levies; the Capital Projects Fund, which is used to build and maintain facilities; the Transportation Vehicle Fund, which pays for buses; and the Associated Student Body Fund, to which students who wish to participate in extracurricular activities contribute $30 to defray program expenses such as travel and referees. The Kunkels believe that their children's education has been negatively impacted by the district's lack of funds, and that each child would benefit from better facilities and programs, more buses to reduce the time spent getting to and from school, and equipment that is up to date.
 
 
 11
 The Kunkels and Okanogan brought this suit to stop the state from reducing the school district's BEA by the amount of federal forest funds it receives. They also sought damages. The school district was dismissed on SPI's motion pursuant to Fed.R.Civ.P. 12(b)(6), as a political subdivision of the state may not challenge the validity of a state statute in federal court on federal constitutional grounds; the claim of both parties for damages was dismissed because the Superintendent and the Treasurer are state actors and compensatory relief cannot be obtained against the state. On cross-motions for summary judgment, the district court held that the Kunkels lack standing because their injuries are generalized and not causally related to how the state factors forest funds into school financing. The court also concluded that the Kunkels are not within the zone of interests protected by § 500 because it extends to states, school districts and counties, not individuals, and that the problem posed by the Kunkels is a political one best resolved by the state legislature and Congress. Finally, the court did not believe that the Washington statute conflicts with the federal scheme or that the Supremacy Clause was implicated.
 
 The Kunkels and Okanogan timely appealed.[4]
 II
 
 12
 Okanogan contends that it satisfies the core requirements necessary for Article III standing because a forest fund school district is suffering an injury in fact through the state's with-holding of the federal funds provided by § 500; the state is causing this injury by withholding the funds; and the relief requested would redress that injury by requiring the state to pass these funds on to the county for the school district's use. Okanogan acknowledges that we resolved the standing issue in South Lake Tahoe, but argues that we should decline to extend its holding to this case because Congress has specifically named this political subdivision as one of the beneficiaries of § 500. Alternatively, the district urges us to reconsider this issue en banc.
 
 
 13
 South Lake Tahoe controls. There we held that a political subdivision of a state, which a school district unquestionably is in Washington, may not challenge the validity of a state statute under the Fourteenth Amendment. South Lake Tahoe, 625 F.2d at 234; Moses Lake School Dist. No. 161 v. Big Bend Comm'ty College, 81 Wash.2d 551, 556, 503 P.2d 86 (1972) (school district has power only from state legislature). We have declined to recognize an exception for Supremacy Clause claims, Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1364 (9th Cir.1998); Palomar Pomerado Health Sys. v. Belshe, 180 F.3d 1104, 1108 (9th Cir. 1999), and there is no reason to except Okanogan on account of anything in particular that § 500 has to say about school districts. To the contrary, to the extent that § 500 names beneficiaries at all, it names states and counties. It does not mention school districts.
 
 
 14
 Okanogan maintains that there must be some mechanism for enforcing its right to the benefit of § 500 funds, pointing out that in Washington v. Federal Power Commission, 207 F.2d 391 (9th Cir.1953), we affirmed a judgment in favor of the Commission — which had sided with the City of Tacoma, an arm of the State of Washington — in granting a license to build dams under the Federal Power Act that did not comply with state law. However, the issue there was whether a license applicant could act inconsistently with the declared policy of its creator, which we said it could; we had no occasion to consider whether the arm of the state could itself sue its creator in federal court to invalidate the state's policy. That is the issue we considered, and resolved, in South Lake Tahoe.
 
 
 15
 We are bound by South Lake Tahoe, regardless of whether its holding has since been questioned.[5] While school districts may challenge Washington's practice in state court, they lack standing to do so in federal court.
 
 III
 
 16
 The Kunkels submit that they have standing because the state's practice of crediting Okanogan School District's BEA by the amount of its forest fund reserve reduces the money available to the district to spend on facilities and services. In their view, this has led to loss of class time for their children, and a lack of adequate staff and facilities. They argue that if Okanogan were to receive federal forest funds in addition to its full basic education allocation, the district's facilities and services would immediately benefit; this benefit would inure to their benefit, they say, because no matter how the forest funds are used, the children would receive a benefit.[6]
 
 
 17
 The Kunkels' consternation at what they describe as Okanogan's "chronic lack of funds" is understandable, but it does not necessarily follow that their children's education will be positively affected if the state's practice of crediting the district's forest fund monies against the district's BEA were invalidated. To meet the constitutional minimum of standing, the Kunkels must show that they have suffered an invasion of a legally protected interest that is concrete and particularized; that their injury is fairly traceable to how SPI treats forest funds and not to the independent action of some third party not before the court; and that it is likely, as opposed to speculative, that the injury will be redressed by invalidating the state's practice. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Prudential concerns also inform the question of standing. Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In this connection we consider whether the Kunkels' grievance falls within the zone of interests protected by § 500, and whether it is particular to them or so generalized that it is more appropriately addressed to the political branches. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).
 
 
 18
 According to their evidence, the Kunkels' children have inadequate computer training, they lack science equipment and textbooks, and they are forced to spend time in transit from home to school and from one school to another for music and physical education because the older facilities are unable to support such programs and the district has too few buses. Although SPI argues that this does not suffice because they have failed to show concrete educational harm by test scores or other objective measures, the Kunkels have shown that their children suffer some disadvantage in programs they participate in or facilities they use, cf. Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (papers did not show that members used area or would be affected by the government's activities), and will continue to do so as all but one of them will be attending Okanogan schools for a number of years. See City of Los Angeles v. Lyons, 461 U.S. 95, 112, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (plaintiffs seeking injunctive relief must establish they are likely to suffer future injury from similar harms).
 
 
 19
 However, it is difficult to say that the deficiencies in program and facilities about which the Kunkels complain are caused by the state's practice of crediting forest fund reserves against the district's BEA rather than by too little funding in general, or would be redressed by changing it. As a practical matter, the amount of federal forest funds allocated to Okanogan for fiscal year 1998-99 — $91,378.47 — is a small part of the district's overall budget of $7,560,989.76. More importantly, there are several layers of discretion, and many decision-makers, between the distribution of federal forest monies by the state and the educational experience of the Kunkel children.
 
 
 20
 First there is the state. Under § 500, forest funds are not paid by the federal government to school districts or to schools, but to the state to be spent as the state legislature prescribes. Washington has chosen to split those funds fifty/fifty between forest land counties and school districts in forest land counties, which it does not have to do. It could distribute all forest funds for public roads in forest land counties. Or disburse all forest funds to forest land counties, leaving apportionment among public roads, public schools, and public purposes entirely up to county legislative authorities. Or the state could change the formula by which local effort assistance is provided through matching funds. But assuming the present regime remains in place, nothing in § 500 precludes school boards and administrators from exercising their own discretion to spend funds, including funds from forest revenues, as they deem best.
 
 
 21
 Okanogan could use forest funds to hire more teachers or pay teachers more, pay down old debt, repair facilities, buy buses, or lower student fees for extracurricular activities. However, not all options would benefit the Kunkel children and even those that might, would have a remote effect at best. If, for example, the district were to apply an extra $91,378 to the Debt Service Fund, taxpayers — but not students — would primarily benefit. The Kunkels say their children will participate in extracurricular activities regardless of the fee. The evidence shows that only 6.85 percent of the General Fund goes for materials and supplies, and the only capital projects on Okanogan's radar screen are repairs to the bus barn and vocational school. Only adults use the bus barn and the Kunkel children express no interest in taking shop or other classes in the vocational building. Were the district to add buses, the children's ride might be shortened by a few minutes yet there is no showing that this would improve the quality of their education. In short, the school district is an independent actor with the final say on budgeting for schools attended by the Kunkel's children.
 
 
 22
 Not only do these factors raise serious questions about constitutional standing, but prudential principles are implicated as well. For to the extent that § 500 directs forest funds only to the state, to be spent in its discretion for the benefit of public schools and roads in forest land counties, the Kunkels' dispute with SPI arguably falls outside the zone of interests protected by the federal statute and raises instead a general issue about how the state should distribute its education dollars. This may affect those who live in non-forest land counties as well. If so, it is a problem most appropriately addressed to the Washington legislature or Congress.
 
 
 23
 These standing concerns come into better focus when the Kunkels' position on the merits is considered. They contend that Congressional intent could not be clearer: federal forest funds are to be spent "for the benefit of the public schools... of the county or counties" in which the revenues are generated. From this they infer that Congress intended to benefit particular counties, not the state as a whole, and that Washington's practice conflicts with this overriding purpose because the state deducts one hundred percent of the federal forest funds from the school district's BEA. Specific counties, their schools, roads and citizens cannot benefit, or receive any advantage, from forest funds which they do not receive, the Kunkels submit. Rather, they maintain, the only benefit or advantage of the federal funds under Washington's system goes to the state.
 
 
 24
 The difficulty with the Kunkels' argument is that § 500 on its face directs forest funds to the state and permits them to be expended as the state legislature may prescribe for the benefit of public roads or schools of forest land counties. By its terms, no state is obliged to spend any forest fund money for schools. The Supreme Court made this clear early on, when it confirmed in King County v. Seattle School Dist. No. 1, 263 U.S. 361, 364-65, 44 S.Ct. 127, 68 L.Ed. 339 (1923), that Congress accorded the states great discretion in distributing federal forest funds and that the states may use these moneys for public roads or schools as the state deems best.[7]
 
 
 25
 Section 500 differs in this respect from legislation that specifically provides for payments to school districts. See, e.g., Shepheard v. Godwin, 280 F.Supp. 869 (E.D.Va.1968) (construing Federal Impact Aid Act, now codified at 20 U.S.C. § 7703, (West.2001), which pays funds directly to school districts burdened by the federal government's acquisition of property within the district); cf. Carroll v. Bruno, 81 Wash.2d 82, 86, 499 P.2d 876 (1972) (distinguishing impact aid cases and upholding Washington's scheme for distributing § 500 funds against challenge by school districts). The forest fund statute also differs from the text of statutes providing for similar programs but expressly stipulating that the state is to use federal aid only to supplement the amount of funds that would be available from non-federal sources, not to supplant them. See, e.g., Individuals with Disabilities Education Act, 20 U.S.C. § 1412(a)(18)(C) ("funds paid to a State under this subchapter will be used to supplement the level of Federal, State, and local funds (including funds that are not under the direct control of State or local educational agencies) ... and in no case to supplant such Federal State, and local funds ..."); Improving America's Schools Act of 1994, 20 U.S.C. § 6322(b)(1)(A) (1995) ("A state or local educational agency shall use funds received under this part only to supplement the amount of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs assisted under this part, and not to supplant such funds."). These differences indicate that Congress knows how to direct funds to school districts, and to make its distribution preferences clear when it wants to.
 
 
 26
 Congress has left § 500 intact, adding no such conditions to receipt of forest funds. Even though the Kunkels recognize that the text of § 500 hasn't changed, they argue that the Secure Rural Schools and Community Self-Determination Act of 2000, Pub.L. 106-393, §§ 2(a)(3)-(6), 2(b)(1), 114 Stat. 1607 (2000), clarifies that § 500 means that forest funds are intended to supplement, not supplant, other funds available to school districts. This Act consolidates a number of federal aid programs, including § 500, in order to secure minimum payment levels for the future. The Kunkels point in particular to subsections 2(a)(3)-(6), and (2)(b)(1). In these paragraphs, Congress finds (as it did in 1908) that some measure of compensation is appropriate for forest land counties for the benefit of public schools and roads; and articulates that one of the purposes of the 2000 Act is "to stabilize payments to counties to provide funding for schools and roads that supplements other available funds." § 2(b)(1). While this purpose appropriately reflects what Congress intends with respect to statutes that so provide, § 500 itself contains no such declaration. There is no way that it can be read as requiring that forest funds go to school districts, let alone that if they do, they can only be used to augment money that the state — or the district — might otherwise be able to provide.
 
 
 27
 The bottom line is that § 500 allows the Washington legislature to decide how to spend federal forest funds for the benefit of public schools or roads in forest land counties, and its decision to apportion some of those funds directly to school districts in forest land counties comports with § 500. Section 500 does not constrain how the state allocates its own money, or how school districts spend theirs. We therefore affirm dismissal of the school districts, and judgment for the Treasurer and SPI on the Kunkels' claim for relief.
 
 
 28
 AFFIRMED.
 
 
 29
 Opinion by Judge RYMER.
 
 
 
 Notes:
 
 
 [1]
 Seventeen other school districts joined the suit originally, but only eight, including Okanogan, appeal. In addition to Okanogan, the parties on appeal are Republic School District # 309, Oroville School District # 410, Tonasket School District # 404, Omak School District # 19, Nespelem School District # 14, Quillayute Valley School District # 402, and Methow Valley School District # 350. All of these districts are similarly situated to Okanogan, which is the only one that we shall discuss specifically
 
 
 [2]
 For example, voters in Okanogan School District passed a general fund levy in 1998 for $379,814 to be collected in 1999 and 2000. This amounted to $2.03 per $1,000 assessed valuation on property in the year 2000
 
 
 [3]
 These funds are available if the district has passed a levy equal to a state average hypothetical tax rate of 12 percent. Wash. Rev. Code § 28A.500.020. In 1998 Okanogan School District had a twelve percent levy rate of $3.744 compared with a state average of $1.471. In 1999-2000 it qualified for an additional $448,420 in state matching funds to go with the $379,814 it raised through its general fund levy. This meant that property owners in the district paid $2.03 per $1,000 of assessed valuation to collect $860,234 rather than $379,814
 
 
 [4]
 SPI disagrees with the assertion by Okanogan and the Kunkels that the district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) over a claim under § 1983 based on the Supremacy Clause. They citeChapman v. Houston Welfare Rights Org., 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), as so holding. We see no reason to resolve this dispute as there is no doubt that the court had federal question jurisdiction pursuant to 28 U.S.C. § 1331, and that we have jurisdiction of the appeal pursuant to 28 U.S.C. § 1291. Likewise, we express no opinion on the suggestion in reply by the Kunkels and Okanogan that they have in any event stated a claim for relief under Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989).
 
 
 [5]
 See, e.g., Indian-Oasis Baboquivari Unified Sch. Dist. v. Kirk, 91 F.3d 1240 (9th Cir.1996), reh'g en banc granted, 102 F.3d 999 (9th Cir. 1996), appeal dismissed, 109 F.3d 634 (9th Cir.1997) (en banc); Belshe, 180 F.3d at 1110-11 (Hawkins, J., concurring); Burbank-Glendale-Pasadena Airport, 136 F.3d at 1365 (Kozinski, J., concurring).
 
 
 [6]
 The Kunkels pursued a theory of taxpayer standing in the district court, but not in their opening brief on appeal. We deem it abandonedSee Milne v. Hillblom, 165 F.3d 733, 737 n. 6 (9th Cir.1999).
 
 
 [7]
 The Kunkels rely on two state court decisions for the proposition that the states are constrained to exercise their discretion in conformity with the purposes of the statute. However, neitherEminence R-1 Sch. Dist. v. J.D. Hodge, 635 S.W.2d 10 (Mo.1982), nor Trinity Independent School District v. Walker County, 287 S.W.2d 717 (Tex.Civ.App.1956), suggests that states lack freedom to choose between schools and roads or cannot exercise their own judgment in allocating between them for forest land counties.