MATHESON, J., Circuit Judge,
dissenting.
I would reach the merits because Hugo and Irving have standing. I therefore respectfully dissent.
Hugo has standing based on Branson School District RE-82 v. Romer, 161 F.3d 619 (10th Cir.1998). Branson was decided sixty-five years after the Supreme Court last denied political subdivision standing to a plaintiff. During that interval, the trend in the Supreme Court and lower courts was to limit the doctrine to claims based on the specific constitutional provisions invoked in the early Supreme Court cases.
As part of that trend, Branson granted political subdivision standing in a preemption case and formulated a test that allows standing when the plaintiff makes a structural constitutional claim and the plaintiff is sufficiently independent of the parent state. Hugo alleged such a structural claim when it challenged Oklahoma water statutes as unconstitutional under the dormant Commerce Clause. Hugo therefore should receive a decision on the merits.
Irving has standing even if Hugo does not. The political subdivision standing doctrine does not apply to Irving. Apart from Hugo, Irving has asserted a justiciable claim because the Oklahoma water statutes block implementation of its contract to import water from Hugo and because a favorable ruling on its dormant Commerce Clause challenge will remove that barrier.
A. Hugo
I part ways with my colleagues on how to read Branson. The majority reads Branson as allowing a political subdivision to sue its parent state when it claims that a federal statute preempts state law. I read Branson as allowing a political subdivision to sue its state for a dormant Commerce Clause violation.[1]
*1266 The majority and dissenting opinions in this case share much common ground. We agree that courts, including Branson, have “shied away from erecting an absolute bar to political subdivisions asserting rights against their parent states in federal court.” Maj. Op. at 1256. We also agree that Branson recognizes an exception to the political subdivision standing doctrine for certain preemption claims. We further agree that Branson allows standing for claims that seek to protect a structural right.
My basic disagreement with the majority is its failure to recognize that Branson set the terms for future consideration of political subdivision standing in this circuit. Branson canvassed the early Supreme Court cases that prohibited standing and found them to establish only the “limited proposition” that political subdivisions lack standing when a claim is based on a “constitutional provision ... written to protect individual rights.” 161 F.3d at 628. Branson allows standing when the claim is based on a “constitutional provision ... written to protect ... structural rights.” Id.
The majority is correct that Branson did not resolve the “exceedingly important issue” of whether a dormant Commerce Clause claim can support political subdivision standing. See Maj. Op. at 1261. And although the majority correctly reminds us that Branson allowed standing for a preemption claim, it incorrectly denies that Branson set the stage to decide the question presented here: whether the dormant Commerce Clause was written to protect an individual right or a structural right. Branson anticipated this question and foreshadowed the answer.
The answer is that the dormant Commerce Clause protects a structural right and thereby supports political subdivision standing. The rationale for my position will be presented by (1) describing how broad language in early Supreme Court cases that prevented political subdivision suits has been interpreted more narrowly over time; (2) explaining the Branson court’s analysis of the scope of political subdivision standing; (3) addressing whether the constitutional claim in this case is a structural or an individual right claim; and (4) having concluded that Hugo is alleging a structural claim, showing that Hugo is sufficiently independent of its parent state to litigate that claim.
1. Limiting Broad Dicta of Early Cases
Branson should be read in the context of the modern trend to limit the scope of the political subdivision standing doctrine. Branson interpreted two early Supreme Court decisions, Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923), and Williams v. Mayor of Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933). These cases contain broad dicta suggesting that a municipality can never sue its parent state.
In Trenton, the city claimed that a New Jersey statute imposing a fee on the city for withdrawing water from the Delaware River violated the Contract Clause and the Fourteenth Amendment’s Due Process Clause. See 262 U.S. at 183, 43 S.Ct. 534. The Court ruled for New Jersey, holding that “[a] municipality is merely a department of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit.” Id. at 187, 43 S.Ct. 534.
Trenton relied on an earlier precedent, Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). In Hunter the Court approved Pennsylvania’s right to annex the City of Allegheny into the City of Pittsburgh over Allegheny’s objections based on the Contract Clause and the Due Process Clause. Id. at 179, 28 S.Ct. *1267 40. After listing the powers of a state over its municipalities, the Court concluded that “[i]n all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the constitution of the United States.” Id.
In Williams, the Court rejected an equal protection challenge to a Maryland statute exempting a railroad from local taxes. 289 U.S. at 40, 53 S.Ct. 431. Justice Cardozo explained that “[a] municipal corporation ... has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.” Id.
It would be difficult to square Branson’s allowing a political subdivision to sue its parent state with the sweeping dicta of these cases. But the legal landscape changed between 1933 and 1998, and Branson was decided after the Supreme Court had taken a narrower view of these earlier decisions.
The Supreme Court did not address political subdivision standing after Williams until Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In Gomillion, African-American citizens of Alabama sought to enjoin the mayor of Tuskegee and other local officials from enforcing a redistricting plan that, they argued, violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Fifteenth Amendment. Id. at 340, 81 S.Ct. 125. The defendants, relying on Hunter, “invoke[d] generalities expressing the State’s unrestricted power — unlimited, that is, by the United States Constitution — to establish, destroy, or reorganize by contraction or expansion its political subdivisions, to wit, cities, counties, and other local units.”
Id. at 342, 81 S.Ct. 125. The Court, commenting on Hunter and Trenton, explained that
the cases that have come before this Court regarding legislation by States dealing with their political subdivisions fall into two classes: (1) those in which it is claimed that the State, by virtue of the prohibition against impairment of the obligation of contract (Art. I, s 10) and of the Due Process Clause of the Fourteenth Amendment, is without power to extinguish, or alter the boundaries of, an existing municipality; and (2) in which it is claimed that the State has no power to change the identity of a municipality whereby citizens of a pre-existing municipality suffer serious economic disadvantage.
Id. at 343, 81 S.Ct. 125.[2]
The Court determined that the earlier cases’ precedent should be limited to the specific constitutional provisions that those cases addressed. See id. at 344, 81 S.Ct. 125. Justice Frankfurter stated for the Court that
a correct reading of the seemingly unconfined dicta of Hunter and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State’s authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

Id.

The Court summarized its position:
This line of authority conclusively shows that the Court has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences. Legislative control of municipalities, no less than other *1268 state power, lies within the scope of relevant limitations imposed by the United States Constitution.
Id. at 344-45, 81 S.Ct. 125.[3]
Gomillion was not a suit between a municipality and its parent state. But its interpretation of the cases that created the political subdivision standing doctrine is telling. The Court said that state legislative control of municipalities is subject to constitutional limitations. Under the Gomillion analysis, Hunter, Trenton, and Williams prevent political subdivision standing only when a municipality attempts to sue its parent state under the Fourteenth Amendment or the Contract Clause. Some of the circuits also have limited the broad dicta of the earlier cases.[4]
The majority argues that the Supreme Court’s language in Gomillion expressing skepticism about the political subdivision standing doctrine is dicta. But so is much of the language from Hunter, Trenton and Williams that created the political subdivision standing doctrine. With their dicta stripped, those cases hold that a municipality cannot bring suits against its parent state on Contract Clause, Due Process Clause, or Equal Protection Clause grounds. In determining whether a municipality may bring a dormant Commerce *1269 Clause claim, it is at least as helpful to examine the Supreme Court’s dicta from 1960 as its dicta from 1907, 1923, and 1933, particularly because Gomillion spoke directly to the scope of the doctrine.
Consistent with the trend reflected in Gomillion, in Board of Education of Central School District v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Court reached the merits of an Establishment Clause challenge to a New York education statute brought by two local school boards against the state education commissioner of their parent state. The majority points to Allen’s reference to individual board members’ “personal stake” in the case, Maj. Op. at 1260 (quoting Allen, 392 U.S. at 241 n. 5, 88 S.Ct. 1923), but the school boards, not their individual members, were the plaintiffs. What the Court did not do in Allen — and in any other case since 1933-is follow Trenton and Williams and deny political subdivision standing to a political subdivision. As Justices Marshall and White later said, Allen cannot be squared with a bar against political subdivisions’ raising constitutional claims against their parent states. See City of S. Lake Tahoe v. Cal. Tahoe Reg’l Planning Agency, 449 U.S. 1039, 1042, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980) (White, J., joined by Marshall, J., dissenting from denial of certiorari).[5]
The foregoing cases inform the different readings of Branson in this case. The majority reads Branson as a narrow exception to a broad prohibition of political subdivision standing. The dicta in early Supreme Court cases support this reading. But, as the majority acknowledges, courts have retreated from the “absolutist” gloss of the early cases.[6] Maj. Op. at 1259. Taken together, Gomillion and Allen suggest that courts should read the earlier political subdivision standing cases more narrowly than the broad dicta of the earlier cases. That is precisely what Branson did.[7]
*1270 2. Branson and Constitutional Claims
When Branson granted political subdivision standing on a federal preemption claim, it never declared that a political subdivision could sue its parent state only for a preemption claim.[8] The majority would freeze this circuit’s exception to the political subdivision standing doctrine to certain preemption claims. But Branson recognized a broader exception that would allow future consideration of claims based on constitutional provisions written to protect structural rights. Branson did not list which constitutional provisions might qualify because the immediate issue was whether the plaintiffs had standing for their preemption claim. The court left open whether a constitutional provision such as the dormant Commerce Clause would fit its structural rights category.
In Branson, school districts brought a preemption challenge against a voter-approved amendment to the Colorado Constitution, alleging that the amendment violated a federal land trust established by Congress in the Colorado Enabling Act. See 161 F.3d at 625. The defendant state officials argued that the school districts, as political subdivisions, could not sue their parent state. Id. at 628. We recognized the political subdivision standing doctrine stemming from Trenton and Williams: “It is well-settled that a political subdivision may not bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment.” Id. (citations omitted). We upheld the school districts’ right to sue. Id. at 629-80.
Addressing the scope of political subdivision standing, we held that, “[djespite the sweeping breadth of [their] language,” the earlier cases rejecting standing for municipalities raising constitutional challenges against their parent states “stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.” Id. We concluded that “a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal law.” Id.
Branson did not carve out from Trenton and its progeny an exception to political subdivision standing doctrine just to allow judicial review of preemption claims. Instead, Branson read Trenton as establishing a “limited proposition” that blocks judicial review only when “the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.” Id.
In this case, the City of Hugo, an Oklahoma political subdivision, sued members of the OWRB, an Oklahoma state agency, in their official capacities.[9] The difference between this case and Branson is that Hugo asserts a dormant Commerce Clause *1271 claim and the Branson plaintiffs alleged a preemption claim. This court has not previously addressed whether a political subdivision can sue a state for a dormant Commerce Clause violation, but Branson clearly opened the door for a claim based on a “constitutional provision ... written to protect ... structural rights.” Id. at 628. The question in this case, clearly within the Branson ambit, is whether Hugo’s dormant Commerce Clause claim is based on a structural or an individual right.[10]
Branson explains that “a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal law.” Id. (emphasis added). Federal law includes, of course, not only statutes but also constitutional provisions. And Branson did not say that a political subdivision may only sue a parent state when its claim relies' on the Supremacy Clause and a federal statute.
Applying Branson to Hugo, the relevant comparison is not between a Supremacy Clause claim and a dormant Commerce Clause claim. It is between a preemption claim based on a federal statute and a dormant Commerce Clause claim. When either is the basis for a challenge to a state law, the Supremacy Clause is essential to the challenge. The majority is correct that “a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some other federal law, which trumps a contrary state law by operation of the Supremacy Clause.” Maj. Op. at 1256 (emphasis in original). But that is exactly what Hugo is doing — alleging a claim under the dormant Commerce Clause, which is the “other federal law [that] trumps a contrary state law by operation of the Supremacy Clause.”
The Supremacy Clause plays the same role in either case because it requires that the federal law, whether a federal statute or the dormant Commerce Clause, will prevail if it conflicts with state law. All claims alleging a conflict between state law and federal law rely upon the Supremacy Clause priority rule that the “Constitution, and Laws of the United States ... and all Treaties ... shall be ... supreme.” U.S. Const. Art. VI, cl. 2.
If Branson meant to restrict political subdivision standing to certain preemption claims, its distinction between individual and structural rights would be superfluous. Under the majority’s reading, only preemption claims count as a structural right. But Branson did not distinguish between claims based on a constitutional provision and a federal statute. It distinguished between claims based on individual and structural rights. We should therefore decide whether a dormant Commerce Clause claim is based on an individual or structural right.
3. Hugo’s Dormant Commerce Clause Claim Is Structural
Branson divides political subdivision constitutional claims into two categories: structural rights claims, which support standing, and individual rights claims, which do not.[11] We know from Branson’s *1272 reading of Hunter, Trenton, and Williams that the Contract Clause, Due Process Clause, and Equal Protection Clause fall into the individual rights claims category. Dormant Commerce Clause claims, properly understood, fall into the structural rights category.
Branson does not elaborate on its distinction between structural and individual rights. But Branson’s allowing a political subdivision to bring a preemption claim provides a clue to understanding the distinction. A preemption claim alleges that a federal statute is supreme relative to conflicting state law. Such a claim is structural because it concerns the relative authority of federal and state government. An individual right claim, by contrast, concerns the limits of government authority over the individual. Dormant Commerce Clause claims are more like preemption than individual rights claims because they concern the relative power of federal and state government. They ask whether state law improperly interferes with an area of federal concern — interstate commerce.[12]
An additional clue to understanding Branson’s distinction between individual and structural rights are the words “written to protect” in Branson’s key passage that political subdivision standing is forbidden only when “the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.” 161 F.3d at 628.
The Bill of Rights, the Contract Clause (at issue in Hunter and Trenton), the Due Process Clause (at issue in Hunter and Trenton), and the Equal Protection Clause (at issue in Williams) were “written to protect” individual rights. By contrast, the enumerated powers of Article I, Section 8 both authorize and limit what Congress can do, and, from the standpoint of limiting power, were “written to protect” states’ rights. The Commerce Clause, therefore, was “written to protect” the allocation of power between the federal *1273 government and the states. See Akhil Reed Amar, America’s Constitution: A Biography 105-08 (2005); The Federalist No. 45 (James Madison). The implied dormant Commerce Clause protects that structural allocation.
Hugo’s dormant Commerce Clause claim, like the preemption claim in Bran-son, addresses structural issues. “[Tjhere is widespread acceptance of our authority to enforce the dormant Commerce Clause, which we have but inferred from the constitutional structure as a limitation on the power of the States.” United States v. Lopez, 514 U.S. 549, 579, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring). The dormant Commerce Clause doctrine provides that, unless authorized by Congress, states lack power to regulate in certain matters reserved for national legislation.
Both dormant Commerce Clause claims and preemption claims based on federal laws enacted pursuant to the Commerce Clause concern the relationship between federal and state governments and the relative scope of federal and state power. These claims represent the two situations where Article I of the Constitution restrains state regulation of commerce. See Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 175 (17th ed.2010). Congressional intent on the relation between state and federal law is a critical issue when a preemption claim is based on Congress’s exercise of its Commerce Clause power and also when a dormant Commerce Clause claim may be resolved based on whether Congress authorized state regulation. These are “techniques Congress may employ in the ordering [of] relations between the nation and the states.” Id. at 243.
One leading commentator understood the dormant Commerce Clause to be exactly the sort of structural right that Branson meant to allow political subdivision standing: “The Fifth and Tenth Circuits, for example, have limited cities’ standing to cases that involve claims under the Supremacy Clause and other structural restrictions on state power, such as the Dormant Commerce Clause.” David J. Barron, Why (and When) Cities Have a Stake in Enforcing the Constitution, 115 Yale L.J. 2218, 2250 (2006) (emphasis in original).
The conceptual affinity of the preemption doctrine and the dormant Commerce Clause is reflected in cases where both types of challenges are raised against the same statute. For example, in City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), a New Jersey law banning importation of solid and liquid waste from out of state to New Jersey landfills was challenged under both the preemption doctrine and the dormant Commerce Clause. The Court held that federal legislation did not preempt the state law, id. at 620, 98 S.Ct. 2531, but also held that the state law violated the dormant Commerce Clause, id. at 629, 98 S.Ct. 2531.
The resemblance between preemption and dormant Commerce Clause arguments is especially clear in cases addressing whether a federal statute gives congressional consent to state regulation and therefore insulates a state law from dormant Commerce Clause challenge. In Sporhase v. Nebraska, ex rel. Douglas, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), the Court considered whether federal laws consented to a Nebraska law limiting out-of-state transfer of groundwater and thereby insulated it from dormant Commerce Clause challenge. The Court said no. Id. at 960, 102 S.Ct. 3456. The question in consent cases such as Sporhase and in preemption cases is what state legislation Congress intended to allow or disallow when it enacted a federal statute.
*1274 Whether the issue is preemption (Congress has spoken in conflict with state law), dormant Commerce Clause (Congress is silent), or consent (Congress has spoken to authorize state law), all address a common question: the state’s power to act. When a federal statute or the dormant Commerce Clause invalidates a state law, in both instances the Supremacy-Clause requires that result, and both instances involve a federalism analysis, not an individual rights analysis.
In this case, as in Branson, Congress has spoken. A central question is whether the Red River Compact authorizes the Oklahoma statutes that limit interstate commerce in water. Whether the issue is congressional preemption in Branson or congressional consent in this case, both are hinged to structural analysis and determining congressional intent.
The majority correctly indicates that Hugo and Irving have their own economic interests in the outcome of the litigation. But it does not follow that their claim is correctly characterized as based on “constitutional provisions ... written to protect individual rights.” Branson, 161 F.3d at 628. Party interests are at stake in both preemption and dormant Commerce Clause claims, but the nature of the claim — adjudicating the power of the state relative to that of the federal government — is structural, a question of relative state and federal power. Indeed, the Commerce Clause, upon which the dormant Commerce Clause is based, authorizes Congress to regulate interstate commerce and, as an enumerated right, was in part “written to protect” the states from federal overreaching. Litigants basing claims on this Article I provision ask courts to adjudicate questions of relative federal and state power, the answers to which affect the parties’ interests. In short, such cases call for constitutional interpretation of federal rights and state power — structural rights — not individual rights.
Given our Article III standing requirements calling for a plaintiff to show a redressable individual injury in all federal cases, individual interests are virtually always at stake irrespective of the legal basis for the claim. It does not follow that all such claims except for preemption cases fit Branson’s category of individual rights claims. Dormant Commerce Clause claims fit Branson’s structural category.[13]
The scope of analysis presented here is narrow and does not envision, as the ma *1275 jority describes, “a broad availability of suits by political subdivisions to vindicate constitutional interests.” Maj. Op. at 1260. If this dissent were the holding in this case, it would stand only for the proposition that a municipality may sue the state to challenge state laws as unconstitutional under the dormant Commerce Clause because such a claim fits within our Branson analysis. Whether any other constitutional provisions would support political subdivision standing is not addressed here.
4. Hugo’s Independence
According to Branson, in addition to making a claim based on a structural right, a political subdivision must be “substantially independent” from its parent state to have standing. See Branson, 161 F.3d at 639 (quoting Lassen v. Arizona ex rel. Arizona Highway Dep’t. 385 U.S. 458, 459 n. 1, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967)). The school districts in Colorado were substantially independent because they “may hold property in their own name, enter into contracts, and they have the right to sue and be sued in their own name.” Id. at 629. We also noted that the districts “are led by boards that are elected independently.” Id.
The City of Hugo is substantially independent of Oklahoma. Hugo can hold property in its own name, enter into contracts, and sue and be sued in its own name. See Okla. stat. tit. 11, 22-101, 22-104, 37-117. Because Hugo is raising a claim based on a constitutional provision that protects structural rights and is substantially independent from the State of Oklahoma, I would hold that Hugo has standing.
B. Irving
Even if the City of Hugo lacks political subdivision standing, this case should proceed to the merits because the City of Irving has standing to raise the dormant Commerce Cause claim. As the majority notes, Irving, a Texas municipality, faces no political subdivision standing bar. The majority holds that Irving does not meet the redressability requirement of Article III standing.
“Standing under Article III of the Constitution requires that an injury be concrete; particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.” Monsanto Co. v. Geertson Seed Farms, — U.S. -, 130 S.Ct. 2743, 2752, 177 L.Ed.2d 461 (2010). “It must be the effect of the court’s judgment on the defendant that redresses the plaintiffs’ injury, whether directly or indirectly.” Coll v. First Am. Title Ins. Co., 642 F.3d 876, 892 (10th Cir.2011) (quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1159 (10th Cir.2005)).
Irving’s alleged injury is its inability to import water from Oklahoma pursuant to its contract with Hugo. Irving claims that certain Oklahoma water statutes cause this injury because they restrict interstate water transfers compared to intrastate water transfers. The injury is redressable because a successful dormant Commerce Clause challenge to these statutes will remove a major barrier to Irving’s plan to use Hugo’s water.
The majority argues that Irving’s contract with Hugo makes Irving’s Article III standing' dependent on Hugo’s standing and that dismissal of Hugo under the political subdivision standing doctrine eliminates redressability for Irving. But in my view, the contract cuts the other way. By entering the contract, Hugo as seller and Irving as buyer of water have an equal and mutual stake in performance of the contract and the transfer of the water. Hugo, not Irving, is the applicant to the OWRB for approval of the water transfer. But even if Hugo is dismissed from this case *1276 because it cannot sue its parent state, Hugo’s application remains before the OWRB.
Irving has as much stake in the application as Hugo does by virtue of their contract, and Irving’s dormant Commerce Clause claim, if successful, would declare the Oklahoma water statutes unconstitutional and thereby help pave the way for approval of the application. The contract ties Irving to the OWRB’s decision on the application and enables Irving to meet the elements of Article III standing. It is reasonable to expect that the OWRB would respect and follow a decision of this court that the Oklahoma water laws restricting interstate transfer of water from Hugo to Irving are unconstitutional under the dormant Commerce Clause.
For its redressability analysis, the majority relies on Wyoming Sawmills Inc. v. U.S. Forest Service, 383 F.3d 1241 (10th Cir.2004). In Wyoming Sawmills, a timber company alleged that the Forest Service violated the Establishment Clause by expanding a protected area to protect a Native American religious site. Id. at 1243-45. The company’s alleged injury was its inability to access the expanded site to cut timber. Id. at 1246. We held that the timber company’s injury was not redressable:
Wyoming Sawmills has not shown that a timber lease would ‘likely’ become available on the lands within the area of consultation if plaintiff were to have the HPP set aside ... the federal agency has complete discretion as to whether to offer the opportunity sought by the plaintiff, and accordingly the courts do not have the power to grant the only relief that would rectify the alleged injury.
Id. at 1249.
Wyoming Sawmills’ injury was not redressable because the relief it sought— securing a timber lease in the protected area — was too speculative and remote even if the timber company prevailed on its Establishment Clause claim against the Forest Service. Even if it lost the case on the merits, the Forest Service would still have had complete discretion on whether to offer timber leases in the area at issue. Even if leasing opportunities were offered, Wyoming Sawmills would need to qualify for and apply to receive one, and then the company might be competing with others for the lease. Finally, the Forest Service would need to select the company from among the lease applicants.
Wyoming Sawmills is sufficiently different from this case that it supports standing redressability here by comparison. Hugo holds Oklahoma water permits. Hugo and Irving have entered a contract for Irving to use Hugo’s water in Texas. Hugo has applied to the OWRB for approval to implement the contract. Irving alleges that the Oklahoma water laws on out-of-state water use block performance of the contract. With or without Hugo, a successful dormant Commerce Clause challenge would redress this problem by removing a major state statutory obstacle to securing Irving’s contractual water rights through Hugo’s application.
Irving’s situation resembles the plaintiffs in City of Altus v. Carr, 255 F.Supp. 828 (W.D.Tex.1966). In that case, the district court reached the merits of an Oklahoma municipality’s claim that a Texas law banning the export of Texas water to Oklahoma violated the dormant Commerce Clause. Id. at 837-40. Altus had contracted to purchase the water from a private landowner in Texas. Id. at 831. Irving contracted with an Oklahoma municipality rather than a private landowner, but that difference does not diminish Altus as supporting Irving’s Article III standing. Irving, like Altus, has contracted to use water out-of-state and is bur *1277 dened from doing so by allegedly unconstitutional statutes.
Because invalidation of the Oklahoma statutes under the dormant Commerce Clause would redress Irving’s alleged injury, I would hold that Irving, like Hugo, has standing to raise its dormant Commerce Clause claim.

. The issue here differs from our contemporary understanding of Article III standing, which focuses on a plaintiff's personal stake in redressing an injury through federal litigation. In Rogers v. Brochette, 588 F.2d 1057 (5th Cir.1979), the Fifth Circuit traced the political subdivision standing doctrine to Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), which held that the Contract Clause applies to grants of ''private” powers — such as the charter that the colonial government issued to Dartmouth — -and not to grants of "political” powers- — state laws affecting public institutions. See 17 U.S. at 627-30. The Fifth Circuit understood the political subdivision standing doctrine as faithful to the Dartmouth College principle "that the Constitution does not interfere in the internal political organization of states.” 588 F.2d at 1069.
This principle appears to be based on implied federalism limits. If the political subdivision standing doctrine blocks federal court interference with the “internal political organization of states,” neither the preemption claim in Branson nor Hugo’s claim here undermines that principle. We must, of course, analyze Hugo's suit under our circuit’s precedent, which is the analytical framework developed in Branson. That framework allows political subdivision standing "when the constitutional provision that supplies the basis for the complaint was written to protect ... structural rights.” 161 F.3d at 628.

. Hugo's claim is not based on the Contract Clause or the Due Process Clause, and it has nothing to do with Hugo's "boundaries'' or "identity.” Gomillion, 364 U.S. at 343, 81 S.Ct. 125.

. Compare Gomillion, 364 U.S. at 344-45, 81 S.Ct. 125 ("Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution.”) with Maj. Op. at 1259 (“Gomillion is not remotely inconsistent with the view that federal statutes may provide rights to political subdivisions which they can enforce in court, while constitutional guarantees simply do not contemplate political subdivisions' own rights vis-avis their parent states.”).

. There is a circuit split on the political subdivision standing doctrine. The Ninth Circuit appears to be alone in adopting a per se rule against a political subdivision having standing to sue its parent state. See City of S. Lake Tahoe v. Cal. Tahoe Reg’l Planning Agency, 625 F.2d 231, 233 (9th Cir.1980) (establishing the Ninth Circuit's per se rule); see also Palomar Pomerado Health Sys. v. Belshe, 180 F.3d 1104, 1110 (9th Cir.1999) (Hawkins, L, concurring) (noting that other circuits have not adopted a per se rule). We said in Branson that it was arguable whether the Second Circuit had adopted a per se rule in City of New York v. Richardson, 473 F.2d 923, 929 (2d Cir.1973). See Branson, 161 F.3d at 630 n. 8.
The Fifth and Eleventh Circuits join the Tenth Circuit in rejecting a per se rule. See Rogers v. Brockette, 588 F.2d 1057, 1071 (5th Cir.1979) (holding that "the Hunter and Trenton line of cases do not, properly speaking, deal with a municipality’s standing to sue the state that created it” and reaching the merits of a preemption challenge by a local school district against state education authorities); United States v. Alabama, 791 F.2d 1450, 1455 (11th Cir.1986) (holding that "no per se rule applies in this Circuit. In assessing the standing to sue of a state entity, we are bound by the Supreme Court’s or our own Court's determination of whether any given constitutional provision or law protects the interests of the body in question”).
Other circuits have expressed skepticism about a per se rule without definitively resolving the issue. See City of Charleston v. Pub. Serv. Comm’n of W. Va., 57 F.3d 385, 390 (4th Cir.1995) (reaching the merits of a suit between a city and a state agency after noting that the political subdivision standing doctrine is "unclear”); Amato v. Wilentz, 952 F.2d 742, 755 (3d Cir.1991) (finding that "[¡judicial support for this rule may be waning with time”); S. Macomb Disposal Auth. v. Twp. of Washington, 790 F.2d 500, 504 (6th Cir.1986) (noting that "[tjhere may be occasions in which a political subdivision is not prevented, by virtue of its status as a subdivision of the state, from challenging the constitutionality of state legislation”).
Even the Ninth Circuit’s rule has been called into question. See Palomar, 180 F.3d at 1110 (Hawkins, L, concurring) ("The existence of a contrary view in other circuits does not automatically suggest a need to reexamine our own position. However, where the other circuits' view is well and thoroughly reasoned, we should at least satisfy ourselves that our position is grounded in an equally solid rationale”).

. This is not to suggest that Allen erased the political subdivision standing doctrine sub silencio. The Supreme Court has cautioned that "[wjhen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." Ariz. Christian Sch. Tuition Org. v. Winn, - U.S. 1255, 131 S.Ct. 1436, 1448, 179 L.Ed.2d 523 (2011).

. One reason for courts to be skeptical about a blanket standing prohibition is that the early cases failed to specify clearly the constitutional basis for the doctrine. For example, the majority notes "there is serious reason to doubt whether 'standing' in the Article III context is at issue.” Maj. Op. at 1255 n. 4. Given the doctrine's uncertain foundation, courts such as Branson have regarded the TrentonfWilliams precedent as limited to certain constitutional provisions. With the early cases standing for such a "limited proposition,” Branson, 161 F.3d at 628, it follows that it is possible for a political subdivision to rely on a constitutional provision outside the "limited proposition” provisions.

.The majority refers to Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 129 S.Ct. 1093, 1101, 172 L.Ed.2d 770 (2009). Ysursa cites to Trenton and Williams, but only to establish that states may impose regulations on local governments, not that those regulations are immune from constitutional scrutiny. In Ysursa, the Court upheld Idaho’s ban on political payroll deductions as applied to local governmental units under rational basis review. A local teacher's union had challenged the state law as “obstructing speech in the local governments' payroll systems” under the First Amendment. Id. at 1100. The Ysursa Court's central point was that if the law were constitutionally valid at the state level, it was valid at the local level: "The State's
legislative action is of course subject to First Amendment and other constitutional scrutiny whether that action is applicable at the state level, the local level, both, or some subpart of either.” Id. at 1100. The Court said it was "aware of no case suggesting that a different analysis applies under the First Amendment depending on the level of government affected, and the unions have cited none.” Id. Ysursa says nothing about whether local gov- *1270 eminent entities have standing to challenge unconstitutional state laws that affect them.

. The majority quotes from Rogers that "[tjhere is every reason to think that Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere; the Supreme Court has never said otherwise.” 588 F.2d at 1070; see Maj. Op. at 1261 n. 8. The proposition that "the Constitution does not interfere in the internal political organization of states,” Rogers, 588 F.2d at 1070, is compatible with the idea that a political subdivision may raise a constitutional claim against its parent state when that claim (1) does not interfere with the political organization of the state, and (2) following Branson, does not rely on a constitutional provision written to protect individual rights. Hugo is not challenging Oklahoma’s internal political organization; it is challenging Oklahoma’s allegedly unconstitutional water laws.

. As Branson explained, "a suit against a state official in his representative capacity is considered a suit against the official’s office, which is no different from a suit against the *1271 State itself.” 161 F.3d at 628 (quotation omitted).

. Neither the Supreme Court nor a circuit court has addressed this specific question. We should expect a paucity of dormant Commerce Clause cases of this type. State regulation to benefit local interests rarely disadvantages local governments.

. This dissent compares preemption claims and dormant Commerce Clause Claims. It also analyzes the Branson distinction between constitutional provisions that protect individual rights with those that protect structural rights. Nowhere does it address what the majority calls a “false dichotomy” between "preemption claims” and “individual rights” claims. Maj. Op. at 1262-63. The majority, *1272 on the other hand, places "substantive” constitutional provisions off limits for political subdivision standing. Maj. Op. passim. But Branson does not distinguish between substantive and non-substantive constitutional provisions. Instead, Branson distinguishes between a "constitutional provision ... written to protect individual rights,” and a "constitutional provision ... written to protect ... structural rights.” 161 F.3d at 628. Branson forecloses standing when the constitutional provision concerns an "individual” right, not a "substantive” right. Indeed, Branson does not use the term "substantive” in addressing the scope of political subdivision standing.

. Instructive analysis comes from an unlikely source. In Star-Kist Foods, Inc. v. County of Los Angeles, 42 Cal.3d 1, 227 Cal.Rptr. 391, 719 P.2d 987, 992 (1986), cert. denied, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 758 (1987), the California Supreme Court allowed a political subdivision to raise a dormant Commerce Clause challenge to its parent state's law. Star-Kist said a dormant Cornmerce Clause claim should be treated like a preemption claim for political subdivision standing. Relying on Rogers and rejecting the Ninth Circuit’s per se rule against political subdivision standing, the court explained that "[pjolitical subdivisions cannot assert constitutional rights which are intended to limit governmental action vis-a-vis individual citizens but may invoke the supremacy clause to challenge preempted state law.” 227 Cal.Rptr. 391, 719 P.2d at 991 (quotation omitted). Star-Kist reasoned that "the commerce clause resembles the supremacy clause in that it, albeit indirectly, defines the relative powers of states and the federal government,” and "it relates more to the national interest in observing the boundaries of state and federal power.” Id., 227 Cal.Rptr. 391, 719 P.2d at 991-92 (quotation omitted). The caveats, of course, are that Star-Kist is not a federal case, and the political subdivision standing issue arose in the unusual procedural posture of reviewing whether a constitutional defense was valid.

. The few district court cases from other circuits that involved dormant Commerce Clause claims and the political subdivision standing doctrine do not tell us much. In City of New Bedford v. Woods Hole, No. Civ. A 00-12049-DPW, 2003 WL 21282212 (D.Mass. May 23, 2003), the court granted plaintiff’s motion to dismiss without prejudice and did not take a position on the political subdivision standing question, noting that "[t]he principal procedural question at issue — whether a political subdivision of a state has standing to litigate in federal court against another political subdivision of the same state — is one on which the circuits are presently split.” Id. at *2. Dormant Commerce Clause challenges were dismissed on political subdivision standing grounds in two pre-Branson cases from another circuit. See Sch. Dist. of Phila. v. Pa. Milk Mktg. Bd„ 877 F.Supp. 245 (E.D.Pa.1995); Atl. Coast Demolition & Recycling Inc. v. Bd. of Chosen Freeholders, 893 F.Supp. 301 (D.N.J.1995). Atlantic Coast relied on the precedent of Philadelphia. See Atlantic Coast, 893 F.Supp. at 315. In City of New Rochelle v. Town of Mamaroneck, 111 F.Supp.2d 353 (S.D.N.Y.2000), the court dismissed a Fourteenth Amendment claim on political subdivision standing grounds but did not dismiss a dormant Commerce Clause claim. See id. at 364, 368-69. The court explained that "while municipalities or other state political subdivisions may challenge the constitutionality of state legislation on certain grounds and in certain circumstances, these do not include challenges brought under the Due Process or Equal Protection Clauses of the Fourteenth Amendment.” Id. at 364.